IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

HIGHMARK, INC.                    §
                                  §
VS.                               §        CIVIL NO. 4:03-CV-1384-Y
                                  §
ALLCARE HEALTH MANAGEMENT         §
SYSTEMS, INC.                     §

OPINION AND ORDER GRANTING MOTION FOR
EXCEPTIONAL-CASE FINDING AND ATTORNEY'S FEES

Pending before the Court is the Motion for Exceptional Case
Finding and Award of Attorney Fees and Expenses (doc. #513) filed
by plaintiff, Highmark, Inc. ("Highmark").  After review, the Court
concludes that this case is exceptional under 35 U.S.C. § 285 as a
consequence of certain acts of defendant Allcare Health Management
Systems, Inc. ("Allcare"), over the course of the litigation.  The
Court further concludes that sanctions under Federal Rule of Civil
Procedure 11 are appropriate.  Highmark's motion will, therefore,
be granted.

Also before the Court is Allcare's Motion for Hearing (doc. #552)
in which Allcare requests that the Court conduct a hearing on the
motion for exceptional-case finding.  Because the Court has ruled
on the motion for exceptional-case finding based on the briefing,
the Court DENIES the motion for hearing as MOOT.


I.  Background

Allcare is a Virginia corporation with its principal place of
business in Fort Worth, Texas.  Allcare's business is the licensing

of intellectual-property assets.  Among the assets handled by Allcare is U.S. Patent No. 5,301,105 ("the '105 patent").  After conducting a survey of various healthcare management and insurance companies, Allcare filed suit against twenty-four such companies in four separate suits asserting that the companies' computerized information-management systems infringed the '105 patent.

Highmark was among the companies surveyed by Allcare.  In April 2002, Allcare's vice president of licensing, Robert Shelton, wrote a letter to Highmark stating that Allcare believed Highmark's system infringed the '105 patent, requesting that Highmark consider purchasing a license to the '105 patent, and raising the potential for litigation if Highmark refused.  Allcare sent additional letters to Highmark, encouraging Highmark to purchase a license, threatening litigation, and warning Highmark of the "substantial damages" Allcare would pursue, as well as the high costs of litigation.  (Mot. App. at 354 (December 11, 2002, letter from counsel for Allcare, Steven Hill, noting that over $2 million in fees had been expended in approximately 6 months by an entity defending against a related infringement suit by Allcare and that Allcare would be seeking "substantial damages" against Highmark).)

Among the suits instituted by Allcare based on alleged infringement of the '105 patent is *Allcare Health Management Systems, Inc. v. Trigon Healthcare, Inc.*, 1:02-CV-756-A (E.D. Va. Feb. 3, 2003).  Trigon Healthcare, Inc., was also surveyed by Allcare.  Based

apparently on Trigon's responses, Allcare determined that Trigon's system infringed the '105 patent.  After sending Trigon a letter and suggesting it license the '105 patent from Allcare, Allcare filed an infringement suit against Trigon in May 2002. (Resp. App. at 138.) According to Allcare, Trigon and Highmark's defenses to Allcare's allegations of infringement of claim 52 were the same in that both Trigon and Highmark challenged the validity of the '105 patent in light of undisclosed prior art and each claimed that their respective systems lacked a "diagnostic smart system" as required by claim 52. A diagnostic smart system, as contemplated by the '105 patent, is a system in which a physician enters codes symbolizing patient symptoms that are then compared by the computer system to stored data on the usual symptoms of common diseases and ailments. (Cl. Constr. Rep., doc. #367, at 2-3.)  After this comparison, the system generates a list of conditions that are likely the cause of the specific patient's symptoms, along with recommended treatments. (*Id.*)  Allcare filed a motion for summary judgment and, on February 3, 2003, the United States District Court for the Eastern District of Virginia entered its order.  (Resp. App. at 41-66.)  The court concluded that claim element 52(c) did not require a diagnostic smart system and that the entry of data symbolic of patient symptoms did not have to be for the purpose of suggesting a mode of treatment.  (Resp. App. at 45, 51-52).  The court also concluded that the '105 patent is enforceable. (*Id.* at 57-62, 66.)

After the summary-judgment rulings in *Trigon*, Allcare sent another letter to Highmark.   The letter apprised Highmark of the rulings favorable to Allcare in *Trigon*, again requested that Highmark purchase a license and suggested that litigation may be necessary if Highmark refused.  After some discussion between Highmark and Allcare, Highmark filed this action against Allcare seeking a declaratory judgment of invalidity, noninfringement, and unenforceability of the '105 patent. Allcare filed a counterclaim alleging infringement of the '105 patent.

In August 2006, Don W. Martens was appointed special master in this case, and the issue of claim construction was referred to him. Martens submitted a report and recommendation (doc. #367) that the Court adopted in March 2007 (doc. #375).  Martens's report construed the claims at issue in this case--claim 1, 52, 53, and 102.[1]  After Martens's report, in February 2008, Allcare withdrew its counterclaim of infringement as to claim 102 (doc. #481).  Highmark also withdrew its contention of invalidity and unenforceability of claim 1 (doc. #505).  Martens also issued a report on Highmark's motion for summary judgment (doc. #484).  The Court adopted Martens's report and entered summary judgment in favor of Highmark on August 28, 2008 (doc. #503), concluding that the '105 patent is not unenforceable but that Highmark's system did not infringe claim 52 or 53.  As the prevailing party in this patent case, Highmark now seeks attorneys' fees and

---

[1] It should be noted that claim 53 is dependent upon claim 52.  (Doc. #367 at 41.)

4

other expenses.

II.  Discussion

    A.  Legal Standards

        1.  35 U.S.C. § 285

"The court in exceptional cases may award reasonable attorney fees to the prevailing party." 35 U.S.C. § 285. The evaluation of whether attorneys' fees should be awarded under § 285 is a two-step process. *See Digeo, Inc. v. Audible, Inc.*, 505 F.3d 1362, 1366–67 (Fed. Cir. 2007). First, a court must determine whether there is clear and convincing evidence that the case is exceptional. *See id.* at 1367. "The 'clear and convincing' standard is an intermediate standard which lies somewhere in between the 'beyond a reasonable doubt' and the 'preponderance of the evidence' standards of proof." *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1360 n.5 (Fed. Cir. 2007) (citing *Addington v. Texas*, 441 U.S. 418, 425 (1979) and *SSIH Equip. S.A. v. United States Int'l Trade Comm'n*, 718 F.2d 365, 380–81 (Fed. Cir. 1983) (Nies, J., additional views)). "Although an exact definition is elusive, 'clear and convincing evidence' has been described as evidence that 'place[s] in the ultimate factfinder an abiding conviction that the truth of its factual contentions are highly probable.'" *Id.* (quoting *Colorado v. New Mexico*, 467 U.S. 310, 316, (1984)). It is such evidence as to form in the mind of the trier of fact a "firm belief or conviction" as to the truth of the

allegations sought to be established.  *See Trans-World Mfg. Corp v. Al Nyman & Sons, Inc.*, 750 F.2d 1552, 1559-60 (Fed. Cir. 1984) (discussing use of clear-and-convincing standard in proving prior use of a patented invention in overcoming presumption of patent's validity).

"A case may be deemed exceptional when there has been some material inappropriate conduct related to the matter in litigation, such as willful infringement, fraud or inequitable conduct in procuring the patent, misconduct during litigation, vexatious or unjustified litigation, conduct that violates Fed. R. Civ. P. 11, or like infractions." *Brooks Furniture Mfg., Inc., v. Dutailier Int'l, Inc.*, 393 F.3d 1378, 1381 (Fed. Cir. 2005).  A court may find a case exceptional because the case is frivolous.  *See Stephens v. Tech Int'l, Inc.*, 393 F.3d 1269, 1273-74 (Fed. Cir. 2004) (noting that a case may be deemed exceptional due to, inter alia, the frivolity of the suit); *see also Beckman Instruments, Inc. v. LKB Produkter AB*, 892 F.2d 1547, 1551 (Fed. Cir. 1989) (stating that "unjustified litigation" or a "frivolous suit" can form the basis of an exceptional-case finding).  "A frivolous infringement suit is one [that] the patentee knew or, on reasonable investigation, should have known was baseless." *Stephens*, 393 F.3d 1273-74.

An award of attorneys' fees is not made mandatory by an exceptional-case finding.  As the second step of the analysis under section 285, once a case is shown by clear and convincing evidence

to be exceptional, a court must assess whether, in its discretion, an award of fees is justified. *See Digeo, Inc.*, 505 F.3d at 1366-67. A court may exercise its discretion and decline to award attorneys' fees despite such an exceptional-case finding. In assessing whether an exceptional-case finding justifies an award of fees, a court must weigh factors--such as the relative merits of the parties' positions, the tactics of counsel, and the conduct of the parties--that contribute to a fair allocation of the burdens of litigation. *See S.C. Johnson & Son, Inc. v. Carter-Wallace, Inc.*, 781 F.2d 198, 201 (Fed. Cir. 1986).

### 2.   Federal Rule of Civil Procedure 11

A court may also award fees and expenses as a sanction under Rule 11. *See* FED. R. CIV. P. 11; *see also Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 393 (1990) (explaining that the sanctions under Rule 11 "may, but need not, include payment of the other parties' expenses"). Among the bases upon which a court may award Rule 11 sanctions is the failure by a party seeking relief to properly investigate its allegations before filing suit. *See S. Bravo Sys. v. Containment Techs. Corp.*, 96 F.3d 1372, 1375 (Fed. Cir. 1996). In this case, at issue are Allcare's counterclaims of infringement. The United States Court of Appeals for the Federal Circuit has explained:

> Before filing counterclaims of patent infringement, Rule
> 11, we think, must be interpreted to require the law firm

7

> to, at a bare minimum, apply the claims of each and every patent that is being brought into the lawsuit to an accused device and conclude that there is a reasonable basis for a finding of infringement of at least one claim of each patent so asserted. The presence of an infringement analysis plays the key role in determining the reasonableness of the pre-filing inquiry made in a patent infringement case under Rule 11.

*View Eng'g, Inc. v. Robotic Vision Sys.*, 208 F.3d 981, 986 (Fed. Cir. 2000).

### 3.   Inherent Powers

A court may also award fees to a successful party under its inherent equitable power. *See Hall v. Cole*, 412 U.S. 1, 15 (1973). Before a court may exercise its inherent authority to impose sanctions, there must be "a finding of fraud or bad faith whereby the very temple of justice has been defiled." *See Amsted Indus. v. Buckeye Steel Castings Co.*, 23 F.3d 374, 378 (Fed. Cir. 1994). A court's inherent authority is in addition to authority provided by statute or rule. *See id.*

### B.   Analysis

#### 1.   Pre-Filing Investigation

Highmark insists that Allcare failed to obtain an opinion of a lawyer before filing counterclaims of infringement. Highmark also argues that Allcare failed to evaluate whether all of the elements of the patent claims at issue were contained in Highmark's system. In this regard, Highmark argues that although Allcare commissioned

a survey by Seaport Surveys, Inc. ("the Seaport Survey"), to assess the systems of various health-industry companies, including Highmark, Allcare failed to tailor that survey to determine whether the systems of the companies surveyed contained all of the elements of patent claims 52, 53, and 102.  Additionally, Highmark maintains that the fact that its system lacks claim element 52(c), which requires the entry into a system of "data symbolic of patient symptoms for tentatively identifying a proposed mode of treatment," was the key to its defense against Allcare's allegation of infringement regarding claim 52.  Despite this, Allcare never addressed how Highmark's system allegedly encompassed element 52(c), even after Highmark filed a motion for summary judgment on this precise point.

### a.   Need for Opinion by Patent Attorney

Allcare contends that a formal opinion by a patent lawyer is unnecessary for an adequate pre-filing investigation.  Citing *Deering Precision Instruments, L.L.C. v. Vector Distribution Systems*, 347 F.3d 1314 (Fed. Cir. 2003), Allcare notes that the Federal Circuit has "rejected arguments that an action was frivolously filed even when the patentee did not obtain a formal opinion of counsel before asserting infringement."  (Resp. Br. at 13.)  Rather, all that is required is a "good faith, informed comparison of the claims of a patent against the accused subject matter."  *See Q-Pharma, Inc. v. Andrew Jergens Co.*, 360 F.3d 1295, 1302-04 (Fed. Cir. 2004) (denying

Rule 11 sanctions where patentee had made good-faith comparison and concluding the case was not exceptional for same reason).  And Allcare insists it performed such a good-faith comparison.

But the issue in *Deering* appears to have been whether attorneys' fees were justified in light of the patentee's failure to consult a *patent* attorney regarding the patent's prosecution history and infringement under the doctrine of equivalents.  *See Deering*, 347 F.3d at 1321.  And regardless, the Federal Circuit in *Deering* merely decided that the district court had not committed clear error by refusing to conclude that the failure to obtain an opinion of patent counsel is *per se* gross negligence and by otherwise concluding that the patentee's conduct was not harassing.  *See id.* at 1321, 1327. Moreover, Highmark does not limit its complaint to Allcare's alleged failure to secure the opinion of a patent attorney.  Rather, Highmark complains that the only investigation apparent from the record was performed by a layman.

b.  Pre-Filing Investigation by Counsel[2]

Allcare insists that its counsel, Stephen Hill, provided an element-by-element explanation for its allegation of infringement

---

[2] The adequacy of counsel's pre-filing investigation is relevant to both fees under § 285 and sanctions under Rule 11.  *See* Fed. R. Civ. P. 11 (requiring all pleadings to be signed by an attorney whose signature represents that "the claims, defenses, and other legal theories are warranted" after a reasonable inquiry); *Brooks Furniture Mfg., Inc., v. Dutailier Int'l, Inc.*, 393 F.3d 1378, 1381 (Fed. Cir. 2005) (conduct that justifies exceptional-case finding includes "conduct that violates Fed. R. Civ. P. 11, or like infractions").

of claim 52.  (Resp. App. at 139.)  That explanation is allegedly
contained in certain charts that were initially prepared for the *Trigon*
litigation.  Because of the similarity of the issues in this case
and those in *Trigon*, and because counsel for Highmark requested as
much, Hill provided Highmark with the charts developed in connection
with *Trigon*.  (*Id.* at 4, 139-40.)  Hill also purports to have spoken
with experts to confirm his determination of infringement.  (Resp.
App. at 162-63.)

Highmark counters that the *Trigon* charts are insufficient to
establish an adequate pre-filing investigation in this case.  The
charts, according to Highmark, deal with claim construction, not
infringement.  Hill seems to recognize as much in his declaration.
(Resp. App. at 163 (describing the charts from *Trigon* as claim-
construction charts).)  As the United States Supreme Court explained
in *Markman v. Westview Instruments*:

> [A] patent includes one or more 'claims,' which particularly
> poin[t] out and distinctly clai[m] the subject matter which
> the applicant regards as his invention.  A claim covers
> and secures a process, a machine, a manufacture, a
> composition of matter, or a design, but never the function
> or result of either, nor the scientific explanation of their
> operation. The claim define[s] the scope of a patent grant,
> and functions to forbid not only exact copies of an
> invention, but products that go to the heart of an invention
> but avoids [sic] the literal language of the claim by making
> a noncritical change . . . .

*Markman v. Westview Instruments*, 517 U.S. 370, 373-74 (1996)
(alterations in original) (citations and quotations omitted).  On
the other hand, "patent lawsuits charge what is known as infringement,

and rest on allegations that the defendant without authority ma[de], used or [sold the] patented invention, within the United States during the term of the patent therefor." *Id.* at 374 (alterations in original) (internal quotations and citations omitted).  Thus, Highmark argues that the charts address the definition and scope of the '105 patent but do not address whether its system infringes the patent.

A review of the charts submitted by Allcare establishes that the charts do not merely recount the language of the claims at issue and proffer a construction of such claims.  Instead, the charts also purport to include the relevant features of Highmark's system. (Resp. App. at 5-21.)  But Allcare's evidence indicates that the charts' descriptions of features of Highmark's system are based on Allcare's analysis of the *Trigon* system and the perceived similarity between the *Trigon* system and that of Highmark.  In fact, Hill describes Allcare's pre-filing investigation of its claims against Highmark as involving "discussions with technical experts . . . who[] authored an expert report in *Trigon* addressing one or more aspects of patent infringement of *Trigon's* system." (Resp. App. at 163.)

In his declaration, Hill also states that "early in discovery, Allcare provided Highmark with a claim chart in this case which was of our pre-filing analysis of infringement *against Trigon*." (Resp. App. at 140 (emphasis added).)  Allcare's briefing and evidence indicate that the *Trigon* charts were "annotated to take into consideration the technical documents which Highmark withheld until

12

after discovery began in this case." (Resp. Br. at 1 n.2; Resp. App. at 154.) Allcare does not explain how it could demonstrate an adequate pre-filing investigation of its claims against Highmark by producing charts from *Trigon* that obviously could not have been annotated with information Allcare had not yet received from Highmark through discovery. *Cf. Jundin v. United States*, 110 F.3d 780, 784 (Fed. Cir. 1997) (noting Court of Federal Claims Rule 11, patterned after Fed. R. Civ. P. 11, is not satisfied by "after-the-fact" investigation). Indeed, the charts that are contained in Allcare's appendix are dated November 8, 2004, eleven months after Allcare filed its counterclaims.

Highmark also points out that while Hill claims to have conferred with experts regarding his pre-filing infringement analysis, experts were not consulted regarding Highmark's system until after Allcare's counterclaims were filed. Hill states that he relied upon the charts from *Trigon* as to claim 52 but based his assessment of the alleged infringement of other claims "on discussions with appropriate technical consultants such as Dr. Holland." (Resp. App. at 163.) But invoices submitted by Dr. Holland to counsel for Allcare indicate that his earliest involvement in this case was in September 2004, well after Allcare had filed its answer and counterclaims. (Reply App. at 1-3.) Other invoices indicate that Allcare's remaining experts were not involved in this case prior to Allcare's filing of its counterclaims. (*Id.* at 4-10.)

Hill, along with an Allcare expert, also purportedly supervised

Robert Shelton, Allcare's vice president of licensing, in his investigative efforts, which are discussed in detail below. But the expert assistance Shelton received dealt with his preparation of charts addressing the validity of the '105 patent in light of prior art, not whether Highmark's system infringed the '105 patent. (Mot. App. at 91-99.)

Hill broadly states that he was "involved in an investigation . . . [that] included a review of a survey of Highmark." (Resp. App. at 137.) At no point, however, does Hill claim to have directly participated in the interpretation of the Seaport Survey results. To the contrary, in discussing Allcare's pre-filing investigation efforts, Hill cites Allcare's interrogatory responses which, in turn, recount Shelton's interpretation of Highmark's survey responses. (Resp. App. at 163 (citing Mot. App. at 176-79).) Indeed, these responses indicate that it was Shelton who formed the "opinion" and belief that Highmark's system infringed the '105 patent underlying Allcare's allegations. (Mot. App. at 165.) And Hill's discussion of his supervision of Shelton never addresses Shelton's interpretation of the Seaport Survey results or any role Hill might have played in such interpretation. (Resp. App. at 189-92.)

Allcare has produced a declaration by Hill, largely comprised of other broad statements and general assurances, to support its contention that it adequately investigated its allegations before filing counterclaims. But the only documentary evidence of Hill's

14

investigation are the charts developed in *Trigon*, which Hill "annotated" with information that was not received until after Allcare's counterclaims were filed. (Resp. App. at 140, ¶12.) This is representative: Hill's statements regarding pre-filing investigation are without documentary support while his statements regarding post-filing investigative efforts are supported.

Hill's general assurances do not overcome the lack of any discussion or evidence of his specific efforts in investigating Highmark's system as opposed to the system in *Trigon*. Allcare protests that it has not provided Highmark or this Court with notes or documents verifying Hill's pre-filing investigation because such things would reflect Hill's opinions and thought process and are, therefore, privileged. An attorney's opinions regarding a patent are privileged. *See Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.*, 383 F.3d 1337, 1344 (Fed. Cir. 2004) (en banc). But Allcare's decision to claim privilege in briefing this motion is questionable given its apparent failure to list documents related to Hill's analysis on its privilege log. *Cf. Rambus Inc. v. Infineon Techs. Ag.*, 318 F.3d 1081, 1106 (Fed. Cir. 2003) (affirming district-court ruling that failure to disclose documents on privilege log was litigation misconduct). And regardless of the existence of privilege at the time Highmark served discovery requests on Allcare, Allcare has asserted Hill's analysis as a defense to Highmark's motion for attorneys' fees. (Resp. Br. at 2.) Allcare has, therefore, waived the attorney-client

15

privilege in regard to the issue of its pre-filing investigation. *See In re Echostar Commc'ns. Corp.*, 448 F.3d 1294, 1300 (Fed. Cir. 2006) (asserting the advice of counsel as a defense waives the attorney-client privilege for all communications on the subject matter and documents memorializing such communications).

Even assuming that Hill's opinions and mental impressions developed during his pre-filing investigation are privileged, Hill's declaration provides almost no detail regarding his efforts in conducting a pre-filing investigation. Hill simply asserts that he was "involved in an investigation into the technology of Highmark, Inc.," prior to filing counterclaims and engaged in an "element-by-element comparison of each claim . . . to the accused Highmark system." (Resp. App. at 137.) But the specific investigation efforts that Hill discusses refer to the *Trigon* charts, which were annotated with information on Highmark's system after Allcare's counterclaims were filed, and Hill's post-filing consultation with experts.

The almost complete lack of detail in Hill's declaration regarding pre-filing investigation efforts, coupled with Allcare's failure to produce any documentary evidence of such efforts and its contradictory and suspect tactic of relying on counsel's advice as a defense to Highmark's motion while asserting that such advice is privileged leave the Court with the firm conviction that Hill performed either no pre-filing investigation at all, or one that was inadequate. *See Calloway v. Marvel Entm't Group, Div. of Cadence Indus. Corp.*, 854 F.2d 1452,

1471 (2d Cir. 1988) (lack of affidavit by attorney detailing pre-filing investigation suggests no investigation was made), *rev'd on other grounds Pavelic & LeFlore v. Marvel Entm't Group, Div. of Cadence Indus. Corp.*, 493 U.S. 120 (1989); *cf. Eltech Systems Corp. v. PPG Indus., Inc.*, 710 F. Supp. 622, 637-38 (W.D. La. 1988) *aff'd*, 903 F.2d 805 (Fed. Cir. 1990) (citing *Kori Corporation v. Wilco Marsh Buggies & Draglines, Inc*., 761 F.2d 649, 656-57 (Fed. Cir. 1985); *Underwater Devices, Inc. v. Morrison-Knudsen Co.*, 717 F.2d 1380, 1390 (Fed. Cir. 1983)) (patentee's otherwise unreasonable pre-filing investigation not excused by reliance on undisclosed oral opinion of counsel because court could not "assess the reasonableness of the opinion"). When Hill's lack of or inadequate investigation is coupled with the portions of Allcare's interrogatory responses establishing that it was Shelton who formed the opinion and belief that Highmark's system infringed the '105 patent, the Court is convinced that it is highly probable that the only pre-filing assessment of the Seaport Survey responses was performed by Shelton. This abdication of the responsibility for assessing the merit of a potential allegation of infringement falls short of what Rule 11 requires. *See* Fed. R. Civ. P. 11(b) (stating that by advocating a filing, an attorney certifies the propriety of the legal positions and truthfulness of the factual contentions contained in the filing); *Pavelic & LaFlore*, 493 U.S. at 125 (explaining that the "signing attorney cannot leave it to some trusted subordinate, or to one of his partners, to satisfy himself

17

that the filed paper is factually and legally responsible; by signing he represents not merely the fact that it is so, but also the fact that he *personally has applied his own judgment*") (emphasis added).

### c.   Pre-Filing Investigation by Allcare

Allcare insists that Shelton's investigative efforts alone are enough to stave off attorneys' fees and sanctions.  In doing so, it insists that Shelton was qualified for the work he performed--interpreting the Seaport Survey results, researching Highmark's system, and evaluating infringement--and was properly supervised.

Allcare's evidentiary support for Shelton's investigative efforts consists of its responses to Highmark's interrogatories.  (Mot. App. at 162-66.)  Those responses disclose that after Allcare received Highmark's answers to the Seaport Survey, Shelton undertook additional research on Highmark's system via public information available on the internet.  (*Id.*)  In fact, a demonstration version of Highmark's system with an example-user interface was available on the internet and apparently discovered by Shelton during his research.  (Mot. App. at 346-47 (letter by Hill to Highmark discussing the navimedix, vodium, and clarityvision websites).)

Shelton wrote a letter to Highmark's chief executive and financial officers and its general counsel in April 2002, suggesting that Highmark purchase a license of the '105 patent and hinting that failure to do so would result in a suit.  (*Id.* at 164, 342-44).  After Highmark

18

denied that its system infringed the '105 patent, Shelton engaged in further research.  (*Id.* at 165.)  After his research, which apparently included the review of thousands of pages of documents, Shelton came "to believe" and "formed the opinion" that Highmark's system was a "smart system"--a system that, through the use of symptom codes, could indicate an insurance provider's approval or denial of authorization for a medical procedure--and, therefore, infringed the '105 patent.  (Mot. App. at 162-66.)

Highmark complains that Shelton is not qualified to perform a pre-filing investigation because he is neither an engineer nor a patent lawyer.  Allcare counters that, as Allcare's vice president of licensing, Shelton is experienced in patent matters.  He is also the named inventor on two U.S. patents related to healthcare technology. The charts prepared by Shelton were reviewed for accuracy by Allcare's expert, Robert Gross.  And Highmark did not point out any specific deficiency in the charts during its deposition of Gross or before the special master, and does not do so now.  (Resp. App. at 189-91.)

But the charts prepared by Shelton and reviewed by Gross address the validity of the '105 patent in light of prior art, not whether the '105 patent was infringed by Highmark's system.  (Mot. App. at 91-99.) These are separate issues. *See Lawman Armor Corp. v. Winner Int'l LLC*, 437 F.3d 1383, 1385 (Fed. Cir. 2006).

And Shelton's qualifications aside, the plain language of Rule 11 states that it is the attorney that represents to the court, by

19

filing, signing, or advocating a pleading, that the contentions presented in that pleading are warranted after reasonable inquiry. *See* FED. R. CIV. P. 11(a), 11(b).  However qualified Shelton may be or however extensive his investigative efforts, they do not fulfill the requirement of Rule 11.  *See Q-Pharma, Inc.*, 360 F.3d at 1300 (noting that Rule 11 "requires an *attorney* to conduct a reasonable inquiry into the law and facts before filing a pleading") (emphasis added).  Consequently, a violation of Rule 11 was committed regardless of Shelton's efforts.  *See S. Bravo Sys. v. Containment Techs. Corp.*, 96 F.3d 1372, 1375 (Fed. Cir. 1996) (where evidence indicated that attorneys had merely relied on client's lay opinion that patent was infringed, Federal Circuit reversed and remanded district court's denial of Rule 11 sanctions stating that if such were the case, "it would be difficult to avoid the conclusion that sanctions are appropriate"); *also cf. Judin v. United States*, 110 F.3d 780, 784 (Fed. Cir. 1997) (attorney violates Court of Federal Claims Rule 11, patterned after the 1983 version of civil rule 11, by "giving blind deference to his client" regarding infringement analysis).

### d.  Reliance on *Trigon* Rulings

Highmark also complains that rather than perform an adequate pre-filing investigation of its system, Allcare pursued infringement claims against Highmark based on the summary-judgment rulings in *Trigon.*  The rulings in *Trigon* are relevant to the issue of whether

Highmark's system infringed the '105 patent only to the extent that Highmark's system and the system in *Trigon* are the same.  There is no indication in the record that Allcare investigated Highmark's system or compared it to Trigon's system before filing counterclaims against Highmark.  Yet Allcare points to the *Trigon* rulings as justification for its claims of infringement against Highmark.

In any event, the *Trigon* rulings dealt almost exclusively with the issues of claim construction, unenforceability, and invalidity of the '105 patent with regard to claim 52.  The *Trigon* court's infringement analysis consists, in its entirety, of two sentences in which the court declares, without elaboration, that "summary judgment is inappropriate" because "there are genuinely disputed issues of material fact." (Resp. App. at 65.)  The fact that Allcare obtained a favorable *construction* of claim 52 in *Trigon* did not satisfy its obligation to perform a pre-filing investigation regarding Highmark's alleged *infringement* of claim 52 before filing its counterclaim in this case.  With regard to claim 102, Allcare does not discuss, nor does the Court's review of the *Trigon* summary-judgment ruling disclose, how the *Trigon* rulings on claim 52 bears on infringement of claim 102, if at all.

> e.   Availability of Information for Pre-Filing
>      Investigation

According to Highmark, Allcare had tools with which to perform an adequate pre-filing investigation of Highmark's system--for

starters, the Seaport Survey.  (Mot. App. at 68-69; 463.)  Allcare reports that the Seaport Survey was presented to healthcare companies as an attempt "to identify organizations that [were] the leaders in the electronic processing of authorization and referral requests." (Mot. App. at 521.)  In reality, the survey was an effort by Allcare to identify companies using healthcare information-management systems similar to that embodied by the '105 patent to justify approaching such companies about purchasing a license of the '105 patent.  (Mot. App. at 68-69; 342-44.)  And, Highmark argues, despite Allcare's control over the Seaport Survey (Mot. App. at 68), Allcare failed to ask questions to determine whether the surveyed companies' systems contained all of the necessary elements of claims 52 and 102. Specifically, the Seaport Survey did not ask about the aspect of claim element 52(c) that was ultimately found to be missing from Highmark's system, i.e., whether Highmark's system permits the entry of symptoms or symptom data for the purpose of tentatively identifying a proposed mode of treatment.  (Mot. App. at 521-37.)  As for claim 102, the Seaport Survey failed to elicit whether Highmark's system possessed claim element 102(b), which requires a system to store symptom and treatment data for a predetermined plurality of health profiles and problems.  (*Id.*)  Nor did the survey inquire as to whether Highmark's system allowed for the sort of interconnection and interaction between system users required by claim 102's preamble.  Allcare's response does not address these alleged deficiencies.

22

Instead, Allcare asserts that it requested documents relating to Highmark's system but Highmark, on confidentiality grounds, refused to provide them. Allcare's argument seems to be that Highmark placed Allcare in an untenable position. First, Highmark sued for a declaratory judgment, thus initiating this litigation and compelling Allcare to file its counterclaims. Then, contrarily, says Allcare, Highmark now insists that Allcare should have performed a better pre-filing investigation despite Highmark's refusal to provide information on its system to Allcare. Allcare demands that these factors be weighed against finding this case exceptional.

The Federal Circuit has, under some circumstances, concluded that an alleged infringer's failure to provide information requested by a patentee justifies a conclusion that a case is not exceptional. For instance, Allcare cites *Hoffmann La Roche, Inc. v. Invamed, Inc.*, 213 F.3d 1359, 1364 (Fed. Cir. 2000). There, the patentee claimed that it had requested information on the alleged infringer's manufacturing process but was denied that information due to a confidentiality agreement. The patentee filed suit and stated in its complaint that it was unaware of any technique by which it could reverse engineer the alleged infringer's product and thereby determine the alleged infringer's process. Noting that the alleged infringer suggested no alternative method of gathering the necessary information, and that had the alleged infringer simply provided the information, as it eventually did, it could have avoided litigation, the court

23

of appeals affirmed the district court's denial of Rule 11 sanctions and § 285 attorneys' fees. *Hoffmann La Roche, Inc. v. Invamed Inc.*, 213 F.3d 1359, 1363–65 (Fed. Cir. 2000).

In this case, however, the alleged infringer has suggested an alternative method of gathering information.  Highmark notes that it answered Allcare's survey questions.  But the fact is Allcare did not ask about certain essential elements of claims 52 and 102.

Regardless of the survey results, by all accounts a large amount of information regarding Highmark's system was available publicly. Allcare even discovered a demonstration version of Highmark's system complete with a representative user interface. (Mot. App. at 346–47.) This interface displayed what code was used by Highmark's system (ICD9 as opposed to CPT) and what the code was used for (to indicate symptoms rather than to determine a proposed treatment). (*Id.* at 347.)  These aspects of Highmark's system played a key role in its defense against Allcare's allegation of infringement of claim 52 and the summary judgment that was ultimately issued in this case.  At the least, Allcare should have used available information to further assess Highmark's system before filing its counterclaims.  But as discussed above, available information was never evaluated by an attorney.

f.  Highmark's Initiation of this Suit

As noted, Allcare claims that shortcomings in its pre-filing investigation may be attributed to the fact that Highmark filed this

declaratory-judgment action and, therefore, Allcare was forced to respond.  At least one court has taken into consideration the fact that the alleged infringer initiated litigation, thus pressing the patentee to take responsive action. *See Polarity, Inc. v. Diversified Techs., Inc.*, No. C-06-0646 EMC, 2006 U.S. Dist. LEXIS 89802, at *14-15 (N.D. Cal. Nov. 29, 2006).  The court in *Polarity* did not find conclusive the mere fact that a preemptive declaratory judgment was filed, but instead considered what the declaratory-judgment suit disclosed about the circumstances of that case--the alleged infringer's refusal to respond to attempts to communicate or negotiate by the patentee.

In this case, Allcare sent a letter to Highmark suggesting that Highmark purchase a license to the '105 patent from Allcare to prevent the need for litigation. (Mot. App. at 342-44.) Highmark then engaged in communications with Allcare over the next year to assess the merits of Allcare's allegations and to dissuade Allcare from pursuing litigation. (*Id.* at 164, 750.)  Only after it became clear that Allcare was bent on pursuing its allegations of infringement did Highmark file its declaratory-judgment action. (*Id.* at 750.)  And cases such as *Polarity* notwithstanding, the Federal Circuit requires that prior to filing a complaint of infringement, including a counterclaim to the alleged infringer's declaratory-judgment action, the patentee "must be prepared to demonstrate to both the court and the alleged infringer exactly why it believed before filing the claim

that it had a reasonable chance of proving infringement." *View Eng'g, Inc.*, 208 F.3d at 986.

Indeed, it would not be unfair to suggest that a patentee have a reasonable basis for believing a potential target has infringed before it makes its first demand that the target purchase a license to use the invention or face the probability of an expensive infringement suit.[3]  If Allcare had investigated Highmark's system sufficiently to have such a reasonable basis, Allcare would not have been in an untenable position when it was served with Highmark's suit.[4]

---

[3] The threat of a suit forces the alleged infringer to investigate the patentee's allegations and the existence of a valid patent, which is itself difficult and costly, and forces the alleged infringer to decide whether to deny infringement and be exposed to costly litigation or enter into licensing negotiations. *See* Gerard N. Magliocca, 82 Notre Dame L. Rev. 1809, 1814-17 (June 2007) (noting that "no simple research can ensure that a technology is not already patented" and that so-called patent trolls operate by obtaining patents that have been dormant and then aggressively and opportunistically enforcing them); *see also* John M. Golden, 85 Tex. L. Rev. 2111, 2125-30 (June 2007) (noting that the weaker the infringement case, the more likely the alleged infringer's decision to settle will be motivated by the high costs of litigation, which causes the settlement to fail to reflect the true economic contribution of the patent to the allegedly infringing product); Marc Morgan, Comment, *Stop Looking Under the Bridge for Imaginary Creatures: A Comment Examining Who Really Deserves The Title Patent Troll*, 17 Fed. Cir. B.J. 165, 174 (2008) (noting that, in addition to the high cost of patent litigation, which averages $2 million per suit, investigating a patent itself can be costly).

[4] Undermining Allcare's argument that it was pressed by Highmark's filing of a declaratory-judgment action into a premature filing of its counterclaims, is Allcare's decision to send Highmark letters requesting that Highmark license the '105 Patent, disclosing Allcare's efforts to litigate the patent against other companies, and threatening litigation for "substantial damages" if a license agreement were not reached. (Mot. App. at 342-61.) *See Wembley, Inc. v. Superba Cravats, Inc.*, 315 F.2d 87, 89 (2d. Cir. 1963) (stating that the availability of declaratory relief reduces the unfair advantage of patentees who threaten suit to obtain a license by allowing the alleged infringer to challenge the validity of the patent and thereby prevent "an invalid patent from remaining in the art of a scarecrow"); *see also Arrowhead Indus. Water, Inc. v. Ecolochem, Inc.*, 846 F.2d 731, 734-735 (Fed. Cir. 1988) (observing that the declaratory-judgment act prevents alleged infringers from being forced into "an in terrorem choice between the incurrence of a growing potential liability for patent infringement and abandonment of their enterprises") *overruled on other grounds by MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118 (2007).

Allcare had only to marshal for its counsel all the knowledge it had that supported a reasonable and good-faith demand on Highmark, its target turned plaintiff. But if Allcare was caught flat-footed by Highmark's preemptive suit, it was not because Highmark acted hastily or unduly aggressively but because Allcare had not done its homework when it began trolling[5] for dollars and threatening litigation almost a year before Highmark filed its suit.

2.  Allcare's Continued Pursuit of Frivolous Claims

Beyond the alleged deficiencies in the pre-filing investigation, Highmark also insists that Allcare should have realized its infringement allegations were meritless soon after the counterclaims were filed and should have withdrawn them. According to Highmark, Allcare was given a chance to inspect Highmark's system in April 2004. At this point, Highmark contends, Allcare should have realized Highmark's system did not contain element 52(c), as construed by this Court, or the required elements of claim 102. But Allcare, who now

---

[5] "Patent troll" is a pejorative term used to describe an entity that "enforces patent rights against accused infringers in an attempt to collect licensing fees, but does not manufacture products or supply services based upon the patents in question." *InternetAd Sys., LLC v. Opodo, Ltd.*, 481 F. Supp. 2d 596, 601 (N.D. Tex. 2007). In this case Allcare's actions align with the sort of conduct that gives the term "patent troll" its negative connotation. Allcare used a survey with a stated purpose of identifying leaders in the medical-information-processing industry as a ruse to identify potential targets for licensing demands, accused Highmark of infringing the '105 patent and, ultimately, filed counterclaims for infringement against Highmark having never performed an adequate investigation of such claims, and, along the way engaged in questionable and, at times, deceitful conduct.

complains that any deficiencies in its pre-filing investigation are due in part to Highmark's refusal to provide confidential technical documents until suit was filed, did not even take an expert to inspect Highmark's system. (Mot. App. at 751.) This, notwithstanding Hill's statement in a July 2002 letter that if, after being presented with Allcare's claims and supporting evidence, Highmark continued to insist its system did not infringe the '105 patent, the only plausible way to bridge the gap would be for an Allcare representative, Hill, and "one or more industry experts . . . to make an hands-on inspection" of Highmark's system.  (Mot. App. at 348.)

Allcare offers no explanation for its failure to inspect.  It does explain that it maintained its allegations of infringement of claims 52 and 102 after the April 2004 inspection because it was spurred on by the *Trigon* summary-judgment rulings and the fact that, as an apparent result of the rulings, five healthcare companies licensed the '105 patent rather than contest validity.  In this regard, Allcare's reliance on the *Trigon* rulings has some purchase.  The Federal Circuit has approved of a district court's consideration of the fact that other alleged infringers, similarly situated, had settled cases with a patentee under § 285.  *See J.P. Stevens Co. v. Lex Tex., Ltd.*, 822 F.2d 1047, 1049, 1051 (Fed. Cir. 1987).  But the district court in *J.P. Stevens Co.* had considered the settlement of other cases in concluding that attorneys' fees were inappropriate *despite* an exceptional-case finding.  *See id.*   And, as already discussed,

reliance on the *Trigon* ruling is only reasonable to the extent Allcare investigated Highmark's system and found it similar to that in *Trigon*--something that was never established in this case.

Highmark further argues that Allcare should have realized that its infringement counterclaims were frivolous because Allcare's own expert, Dr. Holland, conceded in his August 2007 deposition that Highmark's system did not infringe the '105 patent. As an example, the preamble to the 102 claim limits itself to a system including an "integrated interconnection and interaction of the patient, healthcare provider, bank or other financial institution, insurance company, utilization reviewer/case manager and employer." (Cl. Constr. Rep., doc. #367, at 20-21.)  Holland admitted in his deposition that Highmark's system does not provide for the sort of interconnection and interaction required by claim 102.  Thus, according to Highmark, Allcare should have known that its infringement allegations regarding the 102 claim were frivolous by this point.

The effect of a claim's preamble is a matter of claim construction.  *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1305 (Fed. Cir. 1999).  Hence, whether claim 102's preamble limited the scope of the claim might have been arguable at the outset of this litigation.  But once this Court, on March 23, 2007, adopted the special master's report on claim construction, the scope of the claims at issue was clear.  (Doc. #375.)  Five months later, when its own expert recognized that Highmark's system did not possess all

29

of the elements of claim 102, Allcare should have realized its allegation was meritless.

But Allcare maintained its allegations of infringement of claim 102 until February 6, 2008 (doc. #481), well after claim construction in this case clarified the elements of claim 102 in March 2007, and also well after Allcare's own expert's report indicated that claim 102 was not infringed by Highmark's system.  Allcare explains that Holland highlighted nineteen paragraphs of his report that supported infringement of claim 102.  (Resp. App. at 156.)  But the report, and specifically these paragraphs, are not included in Allcare's appendix.[6]

Highmark complains that Allcare's continued pursuit of frivolous allegations increased the cost of the litigation.  In support, Highmark states that because of Allcare's continued pursuit of its allegation of infringement of claim 102, it was necessary for Highmark to retain a rebuttal expert.  Highmark had to include arguments regarding claim 102 in its motion for summary judgment, filed October 31, 2007, as well.  (Doc. #400.)

Just as with claim 102, the elements of claim 52 were made clear by the special master's claim construction.  And, also just as with claim 102, that construction made it apparent that Highmark's system did not infringe upon claim 52.  Claim 52(c) was determined to cover

---

[6] Regardless, the reference to these paragraphs in Allcare's appendix indicates that these paragraphs do not address the preamble limitation of claim 102, and thus would not rebut Highmark's argument on this point.

a "diagnostic smart system" as disclosed by the '105 patent, i.e.,
a system in which "the physician enters the patient's symptoms and
the computer system identifies the most likely medical conditions
corresponding to the entered symptoms together with the generally
approved treatment."   (Infringement Rep., doc. #484, at 11.)
Highmark's system uses the codes contemplated by the '105 patent--ICD9
codes--to identify symptoms but not proposed treatment.   Proposed
treatments are entered into the Highmark system by the physician,
not generated by the Highmark system, and are indicated by a CPT code,
not an ICD9.   (*Id*. at 14-15.)   Again Holland's report, served on
Highmark on June 29, 2007 (doc. #406 at 3), demonstrates that
Highmark's system lacked necessary aspects of this claim element.
As the special master explained:

> Accepting, for purposes of this summary judgment motion,
> Dr. Holland's testimony that ICD9 codes are sometimes used
> as data symbolic of patient symptoms, in the accused system
> the physician enters data symbolic of patient symptoms (ICD9
> code), *and* enters data tentatively identifying a proposed
> mode of treatment (CPT Code).   The ICD9 code is not entered
> for identifying a proposed treatment as claimed.   The ICD9
> codes indicate the 'condition for which the patient is
> receiving treatment.' [Citing Holland's report] at ¶ 457.
> They do not *identify* the treatment.

(Infringement Rep., doc. #484, at 14, 15.)   Indeed, as argued by
Highmark, the summary judgment entered in this case in Highmark's
favor was predicated on the concessions and recognitions in Holland's
report.   (*See id.* at 14-15.)

　　　In its supplemental briefing, Allcare argues that during the
oral argument on the appeal of the merits, a comment by a member of

31

the panel of the Federal Circuit recognized that the construction of claim 52 in the Court's order on the summary-judgment motions was different from that in the special master's report.  Specifically, Judge Dyk commented that "what happened here was that you had an initial claim construction from the Special Master which was then elaborated, if you will, in connection with the summary judgment decision."  (Supp. Br. App. at 3.)[7]  But Allcare's argument places far too much emphasis on this comment.

During claim construction, Highmark argued that claim 52(c) was limited to the diagnostic smart system described in patent '105's specification.  (Cl. Constr. Rep., doc. #367, at 40.)  Allcare argued that claim 52(c) covered both the diagnostic smart system as well as a utilization review system embodied in the patent's specification. The special master declined to decide between these alternative arguments, noting that to limit claim 52(c) to the diagnostic-smart-system embodiment would be to impermissibly limit the claim by reference to a specification, while to decide whether claim 52(c) covered the utilization review system would amount to a premature infringement analysis.  (*Id.* at 41-42.)

The special master did, however, construe claim 52(c) and specifically construed the claim element's use of the word "for" as meaning "used to indicate the aim, or purpose of an action or

_____

[7] Citations to the appendix submitted by Highmark along with its supplemental briefing (doc. #541) are cited as "Supp. Br. App. at." Citations to the supplemental appendix submitted by Highmark in the initial briefing of its motion for exceptional-case finding (doc. #533) are cited as "Supp. App. at."

activity." (*Id.* at 40.)  Thus, as of the special master's claim construction, it was apparent that the "aim" or "purpose" of entering "data symbolic of patient symptoms," as described by claim 52(c), is "identifying a proposed mode of treatment." That this construction should have alerted Allcare to the deficiency in its position is all the more apparent when considered in light of the fact that, as of the special master's report on claim construction, all parties agreed that claim 52(c) covered at least the diagnostic-smart-system embodiment, which requires that the system identify a proposed mode of treatment through the use of symptom codes entered by the physician. Although a specific embodiment is not to be used to limit a claim, it is meant to illustrate the meaning and coverage of a claim. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005) ("[C]laims must be read in view of the specification, of which they are a part. [The specification] is the single best guide to the meaning of a disputed term."). As the special master stated:

> The step of "entering . . . data symbolic of patient symptoms for tentatively identifying a proposed mode of treatment" is disclosed in the specification as performed by the central processing system determining the recommended treatment protocols from the entered observed symptoms. '105 Patent at 6:59-67.  The claim is not limited to the specific embodiment disclosed, but the limitation must be construed in that context.  In the context of the specification, "for" . . . require[s] that the proposed mode of treatment must be identified by using the entered symptoms to determine one or more appropriate treatments. That is not done in the accused system, in which the physician enters both the diagnosis or symptoms, and the proposed treatment.

The special master's conclusion that the specific purpose, under claim

52(c), of the entry of symptom codes was to identify a proposed mode of treatment taken in light of the diagnostic-smart-system embodiment makes it apparent that a system such as Highmark's, that does not assist the physician in identifying the illness or a proposed treatment, does not infringe claim 52.

Thus, Judge Dyk's comment aside, the meaning given to claim 52(c) by the special master was clear.  Moreover, Allcare's argument that the meaning given to claim 52(c) in the order on the motions for summary judgment was changed from that recommended by the special master as a justification for its continued pursuit of a counterclaim for infringement of claim 52 is undermined by its own counsel's statements.  During the very oral arguments in which Allcare argues that a changed claim construction was recognized, Hill stated that "[t]he claim construction never changed."  (Supp. Br. App. at 3.)

Allcare states that even the special master recognized this case involved difficult issues.  This is certainly true.  But however difficult some issues in this case may have been, it is no explanation for Allcare's continued pursuit of meritless allegations after the lack of merit became apparent.  In fact, on the same page on which the special master recognized the difficulty of certain aspects of this case, the special master acknowledged that it was clear Hill and Allcare were taking a position inconsistent with Holland's report regarding the role of code entry for diagnosis and treatment regarding claim 52. (Resp. App. at 236.)

34

Even maintenance of frivolous claims is not exceptional according to Allcare. For instance, in *Union Pacific Resources Company v. Chesapeake Energy Corporation*, 236 F.3d 684 (Fed. Cir. 2001) which was an appeal from this Court, the Federal Circuit concluded that this Court did not commit clear error in refusing to find a case exceptional where it was alleged that a frivolous claim had not been withdrawn early enough. *See id.* at 694. The Federal Circuit explained that it is normal for claims and parties to be dropped during the course of litigation, that a narrowing of issues is "sound judicial policy," and that the party seeking fees had not shown that the conduct at issue was "exceptional or vexatious as compared to normal litigation." *See id.*

Conversely, in this case Highmark clearly has shown that Allcare's conduct was not part of normal litigation conduct. Indeed, Allcare's own explanations for maintaining its claims after Holland's report exposed them to be without support establish that Allcare's conduct was not part of normal litigation conduct. Specifically, Allcare attempts to excuse as strategic its delay in withdrawing its allegation of infringement of claim 102. Allcare withdrew its allegation that claim 102 was infringed by Highmark's system after deposing Highmark's expert, Dr. Jeremy Nobel, and concluding that Highmark's contention that claims 52 and 53 were invalid was without merit. (Resp. App. at 158.) Thus, Allcare appears to acknowledge that it continued to pursue meritless allegations as insurance or leverage in relation

to the opposing party's contentions.  This demonstrates that this is not a case in which a party maintained meritless allegations for a brief period or without reflection.  Nor is this merely a case in which the patentee took a position regarding infringement against which summary judgment was eventually entered or with which the Court disagreed.  Instead, Allcare's allegations were shown to be without support by its own expert's report and deposition testimony.  Yet Allcare persisted in its infringement allegations.

### 3.  Continued Reliance on *Trigon*

More generally, Highmark complains that Allcare has continually referred to the summary-judgment ruling in *Trigon* and the licensing agreements that followed as support for Allcare's position in this case.  Allcare has in fact used the similarity of the *Trigon* case in its negotiations with Highmark and throughout this litigation. Before the summary-judgment ruling in *Trigon* issued, Allcare suggested that Highmark set aside $3.75 million in escrow to be paid to Allcare as a license fee in the event Allcare succeeded on its summary-judgment motion.  After the District Court for the Eastern District of Virginia ruled in Allcare's favor, Allcare wrote another letter to Highmark apprising Highmark of the ruling, again requesting that Highmark license the '105 patent, and threatening litigation.  (Resp. App. at 138.)  Further, since its favorable summary-judgment ruling in *Trigon*, and particularly in briefing the issue of the adequacy of

36

its pre-filing investigation in this case, Allcare has continued to rely on its efforts in *Trigon* and upon *Trigon*'s outcome.

"An infringement analysis . . . requires two steps: (1) construction of the claims to determine the scope and meaning of the asserted claims; and (2) comparison of the properly construed claims with the allegedly infringing device." *Deering Precision Instruments*, 347 F.3d at 1322.  As already explained, the *Trigon* rulings did not address infringement in any detail but instead focused on the issues of claim construction, unenforceability, and invalidity.  And Allcare's reliance on *Trigon* as a justification for maintaining infringement claims against Highmark is further undermined by the dubious nature of the *Trigon* rulings.  In interpreting claim element 52(c), which defines claim 52 as entailing the entry of "data symbolic of patient symptoms for tentatively identifying a proposed mode of treatment," the Eastern District of Virginia concluded that the word "for" does not indicate a cause-and-effect relationship but, instead, merely indicates a correspondence between symptoms and the proposed treatment.  That is, the method embodied by claim 52 is not limited to a system in which the doctor's entry of patient symptoms causes the system to identify a proposed mode of treatment.  But one need only consult a dictionary to find that the word "for" indicates a correspondence only when used with regard to quantities, such as "two for one," or in idiomatic expressions, such as "word for word." *See* 4 Oxford English Dictionary 26 (2d ed. 1989)(definitions A.VIII.24 & A.VIII.25

of "for"). And as discussed above, in context, the word "for" clearly indicates a cause-and-effect relationship, not a mere correspondence as determined by the Eastern District of Virginia. *See id.* at 24 (definition A.IV.8.a) (defining "for" as meaning "with the object or purpose of"). Indeed, as comments made by the panel of the Federal Circuit during oral argument of the appeal of the merits in this case indicate, the use of the word "for" discriminates "between [a system] where the computer, with its memory and analytic capability, picks the treatment versus the situation where the physician picks the treatment before the physician even begins to type anything on the form." (Supp. Br. App. at 6.)

Moreover, once a claim construction was issued in this case, the issue became whether Highmark's system infringed the '105 patent as so construed. The *Trigon* rulings became irrelevant. The maintenance of an infringement allegation that "the patentee knows, or on reasonable investigation should know, is baseless constitutes grounds for declaring a case exceptional under 35 U.S.C. § 285." *Eltech Sys. Corp. v. PPG Indus., Inc.*, 903 F.2d 805, 810-811 (Fed. Cir. 1990). Thus, even if an exceptional-case finding might not be justified based on Allcare's scant pre-filing investigation alone,[8]

_____

[8] *See Stephens*, 393 F.3d at 1273-74 ("A frivolous infringement suit [under § 285] is one which the patentee knew or, on reasonable investigation, should have known was baseless."); *see also Ultra-Temp Corp. v. Advanced Vacuum Sys., Inc.*, 189 F.R.D. 17, 22 (D. Mass. 1999) ("[U]nlike Rule 11, a failure to conduct an adequate investigation, without more, is not grounds for finding a case to be 'exceptional' under 35 U.S.C. § 285."); *compare Judin*, 110 F.3d at 784 (sanctions were appropriate under Court of Federal Claims Rule 11 due to lack of pre-filing investigation even where claims were "colorable").

it is justified when considered in combination with Allcare's continued pursuit of allegations shown to be meritless and with its use of other tactics yet to be discussed here.

### 4.   Assertion of Meritless Defenses

Highmark further contends that Allcare asserted meritless defenses.   As already noted, on March 4, 2003, after the summary-judgment rulings in *Trigon*, Shelton, on behalf of Allcare, wrote a letter to Highmark discussing the rulings, proposing that Highmark purchase a license to the '105 patent, and suggesting that litigation might ensue if Highmark refused.   (Resp. App. at 132-33.)   Hill and another attorney representing Allcare, V. Bryan Medlock, were sent copies of the letter.   (*Id.* at 133.)   In the letter, Allcare acknowledges that the *Trigon* rulings have no binding effect on Highmark in this litigation.   (*Id.* at 133.)   Nevertheless, in its original answer, filed December 16, 2003 and signed by Medlock, Allcare asserted that Highmark had participated in defending against the infringement allegations in *Trigon* and was, therefore, bound under res judicata and collateral estoppel to the orders issued in *Trigon.*   (Doc. #22, at 5.)   Highmark filed a motion for judgment on the pleadings as to the res judicata and collateral estoppel defenses, (doc. #28), after which Allcare withdrew the defenses.   Highmark argues that Allcare's answer increased the expense of this litigation and demonstrates Allcare's willingness to make meritless assertions.   Allcare meekly

defends those arguments by noting that it attempted to negotiate the issue without the need for motion practice and that neither the Court nor the special master gave thought to giving the *Trigon* rulings binding effect in this case. (Resp. App. at 167-68.)

But Highmark's point is that despite Allcare's knowledge that the defenses were without merit, it nevertheless asserted them and thereby unnecessarily increased the issues and costs in this litigation.  Allcare's attempt to negotiate the withdrawal of its meritless defenses and the fact that the defenses did not prejudice Highmark's legal position do nothing to address this point.  The evidence of these actions firmly convinces the Court of Allcare's use of frivolous and vexatious tactics and supports an exceptional-case finding and sanctions under Rule 11.


    5.   Allcare's Shifting Claim Construction

Allcare also allegedly engaged in various other acts of litigation misconduct.  The Court concludes, however, that most of the remaining acts alleged by Highmark appear to be discovery disputes that are likely in a complex and hotly contested case.  But Highmark also insists that Allcare's claim construction, particularly with regard to claim element 52(c), "shifted" throughout the litigation.  Allcare explains that it was merely engaged in "word smithing" in an effort to bridge the differences in the parties' proposed constructions. The timing of Allcare's proposed constructions, however, refutes this

40

explanation.

As noted by Highmark, Allcare timely filed its proposed claim construction under the Court's scheduling order. (Docs. #59.) After the scheduling-order deadline and after Highmark filed its motion for summary judgment, Allcare changed its proposed construction in a motion for claim construction. (Doc. #158.) And after the special master had conducted a claim-construction or "*Markman*" hearing, Allcare again altered its proposed construction in a chart of "claim terms at issue and the constructions of said terms that are acceptable to Allcare," which was disclosed to Highmark on November 15, 2006. (Mot. App. at 411.) Highmark points to other changes to Allcare's proposed construction, such as by way of an updated proposed order to Allcare's motion for claim construction after Highmark opposed such motion, but these appear to be due to clerical error or otherwise explainable. (Doc. #269.)

Allcare responds that Highmark suffered no harm as a result of its changing proposed construction. Further, according to Allcare, any harm suffered by Highmark due to the delayed claim construction in this case was not a result of Allcare's changes to its proposed construction. On August 12, 2005, this Court ordered all claim-construction briefing stricken and new briefing due to the Federal Circuit's decision in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005). (Doc. #282.) Even so, the Court rejects Allcare's explanation for its actions. Without reasonable explanation, Allcare presented

41

Highmark with various constructions of the '105 patent's claims, thus complicating Highmark's ability to advance its own claim construction and to defend against Allcare's elusive allegations.

### 6.   Allcare's Control of the Seaport Survey

One last allegation regarding Allcare's conduct during this litigation warrants discussion.   Highmark argues that Allcare misrepresented its role in the formulation and dissemination of the Seaport Survey to the United States District Court for the Western District of Pennsylvania in securing a transfer of venue to this Court. Allcare argued that the Seaport Survey was not a "contact" with the Western District of Pennsylvania for the purpose of personal jurisdiction because Allcare did not control the Seaport Survey.

In his declaration, Shelton clarifies the representations to the Western District of Pennsylvania at issue.   Allcare argued that the Seaport Survey was not a contact with Pennsylvania for jurisdictional purposes because it "did not control the manner in which Seaport Surveys, an independent contractor, went about *completing* the surveys." (Resp. App. at 115 (emphasis added).)   Further, Shelton insists "Allcare did not control how Seaport Surveys carried out its surveys, nor did it dictate what companies Seaport opted to call upon." (*Id.*)

As for the literal completion of the survey, it is true that no Allcare employee or personnel participated in the survey calls

42

in any way, and Allcare was not aware of the survey results until days after the interviews were completed. But Allcare participated in and, indeed, controlled every other aspect of the survey. As for the design of the questionnaire, it appears that Allcare had total control. Shelton states in his declaration that after initial discussions with Seaport, he sent Seaport a draft questionnaire. (Resp. App. at 116.) After initial test surveys were performed, Shelton provided Seaport a revised questionnaire. (*Id.* at 117.) Shelton later provided Seaport a supplemental questionnaire to be used in follow-up interviews. (*Id.*) Seaport's response to Highmark's subpoena confirms Allcare's control over the composition of the questionnaire, stating "[t]he survey questionnaire that we used for this research was provided by Allcare." (Mot. App. at 717.)

The record also indicates that Allcare effectively controlled what companies were to be interviewed. Shelton states in his deposition that he extensively participated in the preparation of the survey and identified some companies that were to be surveyed. (Mot. App. at 271.) Shelton provided a list of fifty companies from which Seaport was to complete twenty initial interviews. (Resp. App. at 116; Supp. App. at 22-24.) An email included in Highmark's supplemental appendix indicates that Shelton specifically identified eleven Virginia-based companies to be surveyed as well. (Supp. App. at 13-14.) As for the remainder of the Seaport Survey, which was to involve the survey of 50 to 100 companies per month for several

43

months, Allcare directed Seaport to locate a list of other firms to interview. (*Id.* at 117.) "The telephone lists were sourced by Seaport Surveys from a provider . . . according to Allcare's specifications" says Seaport. (Mot. App. at 717.)  Then based on the methodology proposed by Allcare, Seaport selected companies, as well as the specific person within a given company, to survey. (Resp. App. 116-18; (Mot. App. at 273 (Shelton stating Allcare instructed Seaport Surveys on "how to go about identifying firms--identifying individuals to interview for completing the survey" ); Supp. App. at 21.)  Thus, Allcare not only provided a list of specific companies for Seaport to survey, Allcare specified the sort of companies it desired to have surveyed so that Seaport could obtain a list, and provided a methodology for selecting companies and individuals to be interviewed. In fact, when Seaport had difficulty getting through to a person to be interviewed at some of the companies surveyed, Allcare offered to research and resolve the issue itself. (Supp. App. at 20.)

The Western District of Pennsylvania does not appear to have placed much weight on Allcare's representation regarding the degree of control over the Seaport Survey. Even so, Allcare's representation to the Western District of Pennsylvania that it "did not control how Seaport Surveys carried out [the] surveys" is at best obfuscatory and it strains the bounds of zealous advocacy. The evidence leaves this Court with the firm conviction that counsel for Allcare, including Hill, who presented the motion to dismiss to the Western District

44

of Pennsylvania did not live up to the spirit, and probably not the letter, of Rule 11 in making the argument.

### 7.   Conclusion Regarding Rule 11 and § 285

#### a.   Rule 11

Having reviewed the arguments and evidence presented by both sides, and having reviewed the record of this case as a whole, the Court finds that no pre-filing investigation of Allcare's counterclaims was performed by an attorney, let alone a patent attorney. This alone warrants sanctions under Rule 11. *See Pavelic & LaFlore*, 493 U.S. at 125 (signing attorney may not merely trust subordinate or other attorneys "that the filed paper is factually and legally responsible"); *S. Bravo Sys.*, 96 F.3d at 1375 (attorney may not rely on client's lay opinion); *cf. Judin*, 110 F.3d at 784 (sanctions were appropriate under Court of Federal Claims Rule 11 due to lack of pre-filing investigation even where claims were "colorable"). Responsibility for this failure falls predominantly on Hill's shoulders. The record establishes that Hill has been involved in this case since its earliest stages. (See Doc. #4 (motion to dismiss filed with the Western District of Pennsylvania, in which Hill joins).) Despite the designation on the docket of Joseph Cleveland as lead counsel, the evidence in the record shows that Hill has been regarded as Allcare's chief counsel. (See doc. #285 (letter from Cynthia Kernick, counsel for Highmark).) Indeed, Allcare's response to the motion for

exceptional-case finding relies heavily on Hill's declaration and description of the events in this case and, with regard to pre-filing investigation, Allcare relies almost exclusively on Hill's investigative efforts in defending against Highmark's motion.

And as the foregoing analysis establishes, those efforts were sorely deficient. Rather than perform a true pre-filing investigation as to the merits of Allcare's claims of infringement against Highmark, Hill relied on the analysis performed by Shelton, the pre-filing investigation from *Trigon*, and the summary-judgment rulings from *Trigon.* Shelton is a layman, and Rule 11 does not allow an attorney to wholly defer to his client's analysis, particularly in the context of patent litigation, which often involves substantial costs. In any event, Shelton's analysis, as well as the charts and summary-judgment rulings from *Trigon* dealt with claim construction, not infringement. For the *Trigon* investigation and rulings to have any bearing on whether Highmark's system infringed the '105 patent, it would have to be shown that Highmark's system was the same, in relevant aspects, as the system in *Trigon.* This was never shown. Hill provides broad assurances that he performed a proper pre-filing investigation, and he and Allcare rely on his opinions as proof of such investigation. Yet, contrarily, Hill and Allcare assert that the opinions are privileged. In any event, there is no documentary evidence to support Hill's assertions.

Hill was also aware that Highmark could not be held to the rulings

in *Trigon* based on res judicata or collateral estoppel.  Nevertheless, Allcare asserted these defenses in its original answer.  And Hill joined in the motion to dismiss filed with the Western District of Pennsylvania in which Allcare represented that it did not control the Seaport Survey, despite the fact that Allcare clearly controlled all relevant aspects of it.

Hill is not the only attorney whose conduct falls short of what Rule 11 requires.  V. Bryan Medlock of Sidley Austin, LLP, signed Allcare's original answer and counterclaim.  This pleading included not only Allcare's counterclaims of infringement, for which there had been no pre-filing investigation, but also included the res-judicata and collateral-estoppel defenses based on the *Trigon* rulings, which Allcare had previously acknowledged were not viable against Highmark.

Joseph Cleveland, of Brackett & Ellis, PC, appeared in this case on behalf of Allcare in January 2004, and was designated in April 2004 as Allcare's lead attorney.  In October 2004, the parties filed their proposed joint claim construction.  Thereafter, Allcare engaged in needless alterations of its claim construction.  And in responding to the motion for exceptional-case finding, Cleveland and Hill argue that the claim construction changed from the special master's report to the summary-judgment ruling.  They argue that Judge Dyk recognized as much during oral argument of the appeal on the merits, and that this explains their continued pursuit of the infringement claims.

47

But a review of the record shows that the claim construction did not change.  Hill acknowledged this during oral argument before the court of appeals.

Finally, Hill; Cleveland; and Alfredo Silva, Christopher Harrington, Luke McLeroy, and R. Darryl Burke, of the firm McKool Smith, continued to pursue the infringement claims against Highmark, well after those claims had been shown to be without merit.  Allcare's response brief points to the rulings in *Trigon* and agreements by other healthcare-management companies to license the '105 patent as justification for the continued pursuit of claims against Highmark. But the claim-construction rulings in *Trigon* became irrelevant to this case once this Court adopted the special master's report on claim construction in March 2007.  Of course, Allcare might have argued that it continued with its infringement claims in order to appeal the claim construction.  But Allcare has not argued this, and it is noteworthy that Allcare's arguments regarding claim construction were rejected by the Federal Circuit on the appeal of the merits.  To the contrary, Allcare acknowledges that it continued to pursue its infringement allegation as to claim 102 based not on its merit, but as leverage against Highmark's claims.  Regardless, when Allcare's expert acknowledged, by way of his June 2007 report and August 2007 deposition, that Highmark's system lacked essential elements of both claims 52 and 102, Allcare should have withdrawn its claims.  Instead, Allcare persisted, needlessly prolonging this litigation and increasing

its costs.

In light of these actions, the Court concludes that sanctions are appropriate against Hill and his firm, Hill, Kertscher & Wharton, LLP; Bracket & Ellis; V. Bryan Medlock and his firm Sidley Austin, LLP; and McKool Smith. *See* Fed. R. Civ. P. 11(d) (stating that, absent exceptional circumstances, an attorney's firm must be held jointly responsible for his Rule 11 violation).

### b. Section 285

This same pattern of conduct, by clear and convincing evidence, exhaustively identified and examined here, justifies an exceptional-case finding. The evidence establishes with a high probability that Allcare was not some naive or passive participant in this litigation. Rather, it pursued this suit as part of a bigger plan to identify companies potentially infringing the '105 patent under the guise of an informational survey, and then to force those companies to purchase a license of the '105 patent under threat of litigation.

Allcare's vexatious and, at times, deceitful conduct did not stop there. Allcare maintained infringement claims well after such claims had been shown by its own experts to be without merit and did so as a tactic to provide leverage against Highmark's pending claims. It also asserted defenses it and its attorneys knew to be frivolous. Indeed, just to have its case transferred to this Court, Allcare and its attorneys misrepresented their involvement in the Seaport Survey

to the Western District of Pennsylvania.

And Allcare's explanations for its conduct fail under scrutiny. Allcare complains that its inadequate pre-filing investigation was due to the fact that Highmark preemptively filed this declaratory-judgment action. But it was Allcare that began threatening suit almost a year before this action was filed. Allcare complains that Highmark refused to provide discovery-type materials so that the claims of infringement could be properly evaluated. But Allcare concedes that a great deal of information on Highmark's system was publicly available. For instance, in a July 2002 letter to counsel for Highmark, Hill explains that he used an example of Highmark's system available on the internet and a "number of . . . publicly available articles and white papers" in concluding that Highmark's system had aspects that implicated the '105 patent. (Mot. App. at 346.) Hill and Allcare failed, however, to provide any evidence, other than Hill's broad assurances, that this information was ever used in an infringement analysis before the first letter was written to Highmark raising the potential for litigation or before Allcare's counterclaims were filed. Hill and Allcare's attempt to rely on Hill's opinions as justifying the infringement claims and the lack of documentary evidence of an infringement analysis is all the more suspect in light of their attempt to assert that Hill's opinions are privileged.

Further, Allcare's argument that Highmark withheld the evidence necessary for Allcare to properly evaluate its infringement claims

is undermined by Allcare's own failure to take advantage of the information that Highmark did make available.  In the July 2002 letter, Hill states that if Highmark persisted in denying that its system infringed the '105 Patent the only way to proceed would be to have an Allcare representative, Hill, and "one or more industry experts . . . to make a hands-on inspection of" Highmark's system. (Mot. App. at 348.)  Highmark made its system available for inspection in April 2004, but Allcare did not send an expert to inspect it.

Hill's July 2002 letter also refers to the Seaport Survey as supporting Allcare's claim.  But Allcare, which controlled all material aspects of the survey, failed to ensure that questions were asked about key aspects of the systems used by those questioned, undermining the usefulness of the survey as a tool to properly investigate its infringement allegations and exposing the survey as a ploy to identify targets from which a licensing agreement could be demanded.  The evidence presented firmly convinces the Court of these facts, and, in light of them, the Court concludes that this is an exceptional case.


8.   Discretion to Withhold Award

Allcare calls upon the Court, in the event of an exceptional-case finding, to exercise its discretion and deny an award of fees.  In assessing whether an exceptional-case finding justifies an award of fees, a court must weigh factors such as the closeness of the case,

the tactics of counsel, and the conduct of the parties that contribute to a fair allocation of the burdens of litigation. *See S.C. Johnson & Son, Inc. v. Carter-Wallace, Inc.*, 781 F.2d 198, 201 (Fed. Cir. 1986).  Allcare performed a poor pre-filing investigation of its allegations, with no apparent investigation by counsel.  Thereafter, Allcare maintained its allegations after they were shown to be meritless, advanced meritless defenses, and needlessly complicated claim construction.  Allcare also likely misled the district court of the Western District of Pennsylvania.  And while Allcare, as a patent holder, is entitled to enforce the '105 patent, Highmark is entitled to be free from the huge burdens of patent litigation to the extent possible.  *Cf. Judin*, 110 F.3d at 785 (before imposing the burdens of patent litigation on an alleged infringer the patentee must ensure there is a "well-grounded basis" for the suit).  Fees will be awarded and sanctions imposed in this case.

### 9.  Inherent Authority

The Court has concluded that this is an exceptional case under § 285 and that sanctions are appropriate under Rule 11.  There is no need for the Court to exercise is inherent authority to award fees and expenses.

## III.  Conclusion

The Court has concluded that the facts of this case support

imposing sanctions against Steven Hill and his firm, Hill, Kertscher, & Wharton, LLP; V. Bryan Medlock and his firm, Sidley Austin, LLP; Joseph F. Cleveland and his firm, Bracket & Ellis; and Alfredo Silva, Christopher Harrington, Luke McLeroy, and R. Darryl Burke and their firm, McKool Smith, and that there is insufficient cause to exercise its discretion to deny Highmark's request for sanctions. And in light of the conduct discussed above, the Court imposes the sanction of monetary penalties to be paid into the registry of the Court: $25,000 against Steven Hill and Hill, Kertscher, & Wharton, LLP; $5,000 against Alfredo Silva, Christopher Harrington, Luke McLeroy, and R. Darryl Burke and McKool Smith; $2,500 against V. Bryan Medlock and Sidley Austin, LLP; and $2,500 against Joseph F. Cleveland and Bracket & Ellis. These sanctions are imposed under guidance provided by subparagraph (4) of paragraph (c) of Rule 11, which limits sanctions "to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated." The Court expressly refuses to order the sanctioned attorneys to pay any of Highmark's attorneys' fees, believing the penalties imposed suffice, and believing that equity suggests that Allcare, the beneficiary of its attorneys' efforts in this and other brought and threatened cases, should be the entity bearing the primary burden of its over-zealous pursuit of Highmark. These penalties are to be paid into the Court, by way of the clerk of Court, no later than April 30, 2010. *See* Fed. R. Civ. P. 11(c)(4) (listing payment of penalty into court as permissible sanction).

As for an exceptional-case finding under section 285, the Court has concluded this is an exceptional case and that there is no cause to exercise its discretion to deny Highmark's request for fees. Having so concluded, the issue of the reasonableness of the fees requested by Highmark remains. Highmark's current motion addresses the reasonableness of the fees based solely on estimates and acknowledges that additional briefing and evidence in support of fees is necessary. It is, therefore, ORDERED, pursuant to Fed. R. Civ. P. 54(d)(2), that Highmark submit a brief on the reasonableness of the attorney and expert fees it requests no later than thirty days from the date of this order. Highmark must take care in its briefing to request only those attorney and expert fees that it incurred as a result of the conduct of Allcare and its attorneys as discussed in this opinion and order. *See Takeda Chem. Indus. v. Mylan Labs.*, 549 F.3d 1381, 1390 (Fed. Cir. 2008) (noting that fees for an entire suit are rarely awarded). As part of this briefing, Highmark may file under seal invoices reflecting relevant attorney and expert fees. This and any other supporting evidence, as well as Highmark's briefing, must provide sufficient detail and analysis to allow the Court to review the requested fees under the hybrid lodestar approach. *See Maxwell v. Angel-Etts of Cal.*, 53 Fed. Appx. 561, 568 (Fed. Cir. 2002) (applying hybrid lodestar approach to fee award under section 285).[9] Allcare

---

[9] By allowing Highmark to file invoices under seal while limiting it to seeking fees based on the conduct set out in this opinion and order and by requiring Highmark to provide sufficient detail so that its request for fees may be properly analyzed, the Court has essentially granted the relief requested by

may file a response thirty days after the date Highmark's brief is filed. Allcare's response may address the reasonableness of Highmark's requested fees, and the impact any alleged litigation misconduct by Highmark should have on the amount of fees. Highmark may file a reply twenty days after the date Allcare's response is filed.

SIGNED March 31, 2010.

_Terry R. Means_
TERRY R. MEANS
UNITED STATES DISTRICT JUDGE

---

Highmark in its Motion for Leave to File Under Seal (doc. #551) and its Motion for Leave to File, Under Seal, An Appendix in Further Support (doc. #555), while taking heed of the concerns expressed by Allcare in its response. Thus, these motions by Highmark are DENIED as MOOT. Highmark has also filed a Motion to Strike (doc. #561), which seeks to strike proposed findings of fact and conclusions of law filed by Allcare in December 2009, well after briefing of Highmark's motion for exceptional-case finding was closed. The Court did not consider Allcare's late-filed proposed findings and conclusions in this opinion and order and, therefore, Highmark's motion to strike is also DENIED as moot.