IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| HIGHMARK, INC. | § | |
| | § | |
| VS. | § | CIVIL NO. 4:03-CV-1384-Y |
| | § | |
| ALLCARE HEALTH MANAGEMENT | § | |
| SYSTEMS, INC. | § | |

OPINION AND ORDER RECONSIDERING AND VACATING SANCTIONS

Before the Court is the issue of sanctions imposed upon certain attorneys representing Defendant, Allcare Health Management Systems, Inc. ("Allcare"), in the Opinion and Order Granting Motion for Exceptional-Case Finding and Attorneys' Fees ("the Opinion and Order") (doc. #566). Those attorneys filed motions to reconsider the sanctions and, upon reconsideration, the Court will vacate the sanctions portion of the Opinion and Order.


I. Background

The factual background of this case involving United States Patent No. 5,301,105 ("the '105 patent") is set out in the Opinion and Order and there is no reason to restate it here. After final judgment was entered in its favor, plaintiff Highmark, Inc. ("Highmark"), filed a motion ("the exceptional-case motion") seeking attorneys' fees under 35 U.S.C. § 285, Federal Rule of Civil Procedure 11, and the Court's inherent authority, arguing that the conduct of Allcare and certain of its counsel warranted an award of fees. The Court concluded that this case is exceptional as defined in § 285 and accordingly awarded fees to Highmark. The factual basis and legal analysis supporting that

decision are set out in the Opinion and Order and nothing in this order is meant to alter or amend it.

Most of the conduct discussed by Highmark in the exceptional-case motion involved not only Allcare, but Allcare's counsel. Again, Highmark cited Rule 11 as an alternative basis for recovering fees and costs and in one portion of its motion even pointed out that "Rule 11 . . . allows imposition of sanctions on law firms as well as individual lawyers." (ECF[1] Mot. Br., doc. #515, at 18 (quoting *United Stars Indus., Inc. v. Plastech Engineered Prods., Inc.*, 525 F.3d 605, 609 (7th Cir. 2008). Having had allegations of attorney misconduct brought to its attention--allegations that the Court concluded were supported by the evidence--the Court sanctioned the attorneys it concluded were involved: Steven Hill and his firm, Hill, Kertscher, & Wharton, LLP; V. Bryan Medlock and his firm, Sidley Austin, LLP; Joseph F. Cleveland and his firm, Bracket & Ellis; and Mike McKool Jr., Christopher Harrington, Luke McLeroy, and R. Darryl Burke and their firm, McKool Smith LLP ("the Attorneys").

The Attorneys responded to the Opinion and Order with motions to reconsider, arguing that the requirements of Rule 11 had not been met. Specifically, the Attorneys argued that Rule 11 requires that when a party seeks the imposition of sanctions it must do so by a motion separate from any other motion. Highmark's

---

[1] The Court uses "ECF" as an abbreviation for exceptional-case finding to refer to the briefing and appendices submitted in connection with Highmark's motion for exceptional-case finding.

motion was not a proper basis for the imposition of sanctions, the
Attorneys argued, because it combined arguments under section 285
and the Court's inherent authority with Rule 11 arguments.  The
Attorneys further pointed out that before the Court may assess
sanctions sua sponte it must issue an order to show cause describ-
ing the conduct that the Court has determined warrants sanctions
and provide the attorney to be sanctioned a reasonable opportunity
to respond.  Based on these arguments, the Court granted the
motions to reconsider and in the same order required the Attorneys
to respond and show cause as to why they should not be sanctioned.
The Court stated that the factual bases for the potential sanc-
tions were those set out by Highmark in its exceptional-case
motion and those set out in the Opinion and Order.

Now before the Court are the Attorneys' responses to the
show-cause order.  The Court will review the conduct of each of
the Attorneys below.


II.  Discussion

A.  Rule 11 Standards

Federal Rule of Civil Procedure 11 imposes certain stan-
dards upon attorneys who present documents to a federal court.
Specifically, Rule 11(b) provides:

> By presenting to the court a pleading, written motion,
> or other paper--whether by signing, filing, submitting,
> or later advocating it--an attorney or unrepresented
> party certifies that to the best of the person's knowl-
> edge, information, and belief, formed after an inquiry
> reasonable under the circumstances:

(1)    it is not being presented for any improper purpose,
       such as to harass, cause unnecessary delay, or
       needlessly increase the cost of litigation;

(2)    the claims, defenses, and other legal contentions
       are warranted by existing law or by a nonfrivolous
       argument for extending, modifying, or reversing
       existing law or for establishing new law;

(3)    the factual contentions have evidentiary support
       or, if specifically so identified, will likely have
       evidentiary support after a reasonable opportunity
       for further investigation or discovery; and

(4)    the denials of factual contentions are warranted on
       the evidence or, if specifically so identified, are
       reasonably based on belief or a lack of informa-
       tion.

"If, after notice and a reasonable opportunity to respond, the

court determines that Rule 11(b) has been violated, the court may

impose an appropriate sanction on any attorney, law firm, or party

that violated the rule or is responsible for the violation.  Absent

exceptional circumstances, a law firm must be held jointly respon-

sible for a violation committed by its partner, associate, or

employee."  Fed. R. Civ. P. 11(c).


        B.  Analysis

            1.  Steven Hill and the law firm of Hill, Kertscher, &
                Wharton, LLP

                a.  The Motion to Dismiss Before the United States
                    District Court for the Western District of
                    Pennsylvania

In the Opinion and Order, the Court sanctioned Hill for, among

other things, his participation in a motion to dismiss for lack of

personal jurisdiction filed in the United States District Court for

the Western District of Pennsylvania ("the Western District").
This case was originally filed in that court. In connection with
the motion, Robert Shelton, an Allcare vice president, submitted
a declaration in which he discussed a survey used by Allcare to
identify companies using systems that might infringe the '105
patent. This survey, the Seaport Survey, is discussed at length
in the Opinion and Order. (Op. & Order at 42-45.) This Court
found that Allcare represented to the Western District that it did
not control the substantive aspects of the survey, the intended
result being that the Western District would not regard the survey
as a contact, for personal-jurisdiction purposes, by Allcare with
Pennsylvania. As discussed in the Opinion and Order, the evidence
shows that Allcare controlled all of the substantive aspects of the
survey, from the questions asked to the companies surveyed. (*Id.*)
This Court concluded that Allcare's factual arguments to the
Western District, were at best obfuscatory and, thus, tested the
bounds of zealous advocacy.

Hill argues that he cannot be sanctioned based on the motion
to dismiss because he did not "present" the motion. (Hill's SCO[2]
Resp. App., docs. #614 & 615, at 381-82.) Hill explains that he did
not sign the motion, did not participate in any hearing before the
Western District, and did not enter an appearance before that court
until after the motion was filed. (*Id.*) Consequently, Hill
insists that he did not in any way knowingly participate in an

_____
     [2]   The Court uses "SCO" as an abbreviation for show-cause order in
citations to documents.

effort to mislead that court regarding Allcare's control over the Seaport Survey. (*Id.* at 381.) Further, Hill explains that the Seaport Survey itself predated his representation of Allcare, and that he had no part in designing or implementing the survey. (*Id.*)

On the signature issue, Hill cites a line of cases from the United States Court of Appeals for the Fifth Circuit beginning with *Robinson v. National Cash Register Co.*, 808 F.2d 1119 (5th Cir. 1987) that limit sanctions under Rule 11 to a signing attorney. But as explained in *Robinson*, it was the text of the rule at the time that limited its application. *See Robinson*, 808 F.2d at 1125, 1128-29. Prior to the 1993 amendments, Rule 11 did in fact authorize sanctions only against an attorney or pro se litigant who had "signed [a paper] in violation of this rule." Fed. R. Civ. P. 11 (West 1992). After the 1993 amendment, sanctions may be imposed against an attorney who "present[s] to the court (whether by signing, filing, submitting, or *later advocating*)" a document that falls short of the rule's standard.[3] Fed. R. Civ. P. 11 (West 2006) (emphasis added).

And to the extent that Hill's arguments that he did not sign relevant pleadings could be taken as an argument that he did not advocate the related position taken by Allcare, such an argument is contradicted by the record in this case. The evidence shows that Hill has been involved in this case since its earliest stages, that he, along with Shelton, developed Allcare's strategy for this

---

[3] Hill's citation of this outdated line of cases does nothing to persuade the Court that sanctions are not appropriate.

case, and that he has advocated Allcare's positions throughout this litigation. Hill, in his declaration in response to the show-cause order, states that his representation of Allcare began in March 2002. (Hill's SCO Resp. App. at 381.) Medlock, in his declaration in response to the show-cause order, states that in May of 2002 he met with Hill in connection with Allcare's efforts to prosecute the '105 patent. (Medlock SCO Resp. App., doc.#617, at p. 5.) Thereafter, Hill represented Allcare in connection with its efforts to prosecute the '105 patent and was its chief legal strategist and counsel regarding such efforts. Hill was the attorney who engaged in pre-suit communications with Highmark. (ECF Resp. App., doc. #527, at 121-25.) And, once Highmark filed suit, it was Hill and Shelton who led what Medlock describes as a "strategy session" on April 17, 2003, during which they discussed the construction of the '105 patent, rulings in *Allcare Health Management Systems, Inc. v. Trigon Healthcare, Inc.*, 1:02-CV-756-A (E.D. Va. Feb. 3, 2003) ("*Trigon*")[4], and potential infringement claims against Highmark. (Medlock SCO Resp. App. at p.7-17.) Despite any formal appearances or designations with the courts in which this case has proceeded, Hill has consistently been treated as Allcare's lead counsel by Highmark, by co-counsel, and by Allcare itself. (*Id.*; Medlock SCO Resp. App. at 9 (describing Hill as "lead counsel"); (ECF Resp. App. at 121-25 (detailing Hill's efforts prior to suit); Doc. #285

---

[4] *Trigon* is a case in which Allcare was prosecuting the '105 patent against Trigon Healthcare, Inc. ("Trigon"), another user of a health-care information-management system. *Trigon* and its relation to this case is discussed at length in the Opinion and Order.

(letter from Cynthia Kernick, counsel for Highmark.)  It is in this context that Hill insists that he did not advocate the positions taken by Allcare discussed in the Opinion and Order, despite the fact that he is listed as Allcare's counsel on the motion.

Hill also posits that he did not knowingly advocate any misleading factual representation to the Western District.  But under Rule 11, an attorney's conduct is measured by "an objective, not subjective, standard of reasonableness under the circumstances." *Whitehead v. Food Max of Miss., Inc.*, 332 F.3d 796, 802 (5th Cir. 2003).  Although not involved in the design and implementation of the survey, Hill cannot claim ignorance of it, as he claims to have relied on it in developing his understanding of Highmark's system as part of his element-by-element infringement analysis.  (ECF Resp. App. at 137, 139; Hill's SCO Resp. App. at 384.)  Hill was relying on the survey results in July 2002, well before the motion to dismiss was filed in the Western District.  (Hill's SCO Resp. App. at 384.)  And, as just discussed, Hill was Allcare's chief counsel at the time of the motion to dismiss and was listed as Allcare's counsel on the motion.

### b.  Pre-filing Investigation

Rather than dismiss, the judge in the Western District trans-ferred the case to this Court.  Shortly after the transfer, Allcare filed its answer and counterclaims (doc. #22).  The answer and counterclaim are signed by Medlock, with Hill listed as additional

counsel. The filing of counterclaims without an adequate pre-filing investigation is another basis for sanctions in the Opinion and Order. Hill, who was also Allcare's lead counsel in *Trigon*, insists that he performed an element-by-element comparison of Highmark's system, as he understood it, to the relevant claims of the '105 patent. (ECF Resp. App. at 137, 139, 163.)

One source of information on which Hill claims to have relied is the results of the Seaport Survey. In his declaration, Shelton explains that he is Allcare's director and vice president for licensing and that, as part of this job, it is his duty to identify potential infringers. Shelton used various sources of public information to research systems used by companies in the health-care industry to connect to insurance providers and to process authorizations and referrals electronically in the manner Allcare believed to be covered by the '105 patent. (ECF Resp. App. at 114.) To further focus his research, Shelton arranged for the Seaport Survey to be conducted by an independent survey company between August 17, 2001, and June 26, 2002. (*Id*.) Companies surveyed were told that the survey's purpose was to "identify organizations that are the leaders in the electronic processing of authorizations and referral requests." (ECF Mot. App., docs. # 516 & 517, at 520.) As this case demonstrates, the answers provided were actually used to identify potential infringers of the '105 patent and, in turn, used by Allcare to demand that the potential infringer purchase a license to the patent.

Hill, in his declaration in response to the show-cause order, states that his representation of Allcare began in March 2002, after the Seaport Survey had been initiated. (Hill's SCO Resp. App. at 381.) Hill stresses that he did not advise Allcare to undertake the survey and did not participate in the survey. (*Id.*) Nevertheless, he relied on the responses to the survey returned by Highmark and Trigon. Specifically, Hill states that by April 2002, he had performed an element-by-element comparison of Highmark's system with the relevant claims of the '105 patent, and that this comparison was based in part on the Seaport Survey results. (ECF Resp. App. at 137.) Hill came to the general conclusion that the Trigon and Highmark systems were similar in that both are "comprehensive internet-based system[s] connecting, among other things, network health providers to a central health insurance company for permitting the insurer to provide online authorizations of medical procedures to said providers" and "for processing and paying proper medical claims, and pending or denying claims which were not entitled to payment." (ECF Resp. App. at 138.) Consequently, Hill and Allcare believed it was appropriate to contact Highmark and request that it purchase a license to the '105 patent. (*Id.*)

In the Opinion and Order, the Court explained that the mere "threat of a suit forces the alleged infringer to investigate the patentee's allegations and the existence of a valid patent, which is itself difficult and costly, and forces the alleged infringer to decide whether to deny infringement and be exposed to costly

litigation or enter into licensing negotiations." (Op. & Order, at 26 n.4.) However, the above statement by Hill of his understanding of the Trigon and Highmark systems and their similarity to each other embodies the analysis that Allcare has provided to support its first request, made in April 2002, that Highmark license the '105 patent. In the patent context, particularly in the context of the integrated computer-based system embodied by the '105 patent, Hill's rather broad conclusion that the Highmark and Trigon systems shared the general trait of connecting health-care providers to an insurance company to electronically process authorizations and referrals does not reflect the depth of analysis that would justify pursuing an infringement claim against Allcare. *Cf. S. Bravo Sys. v. Containment Techs. Corp.*, 96 F.3d 1372, 1374-75 (Fed. Cir. 1996) (stating that Rule 11 authorizes sanctions for filing claims that are "legally unreasonable [or] without factual foundation"); *also cf. View Eng'g, Inc. v. Robotic Vision Sys.*, 208 F.3d 981, 986 (Fed. Cir. 2000) (stating that before a counterclaim of infringement is filed, the law firm advancing such claim must compare the patent's claims to the accused device and conclude that there is a reasonable basis for a finding of infringement). The conclusions reflect no analysis of the details of Highmark's system or of the '105 patent that have proven central to this case, such as whether participants in Highmark's system are "integrated" in the manner that the special master ultimately determined to be required by claim 102, or whether Highmark's system is able to

11

propose a mode of treatment, as ultimately found to be required by claim 52.

The Court also faulted Hill for improperly delegating his duty to conduct a pre-filing investigation to Shelton. In his declaration in response to Highmark's exceptional-case motion, Hill provides several assurances that he performed a pre-filing investigation using various sources of information. But his assurances are generally conclusory, lacking any real discussion of his research or analysis efforts. On the other hand, Allcare's response to the exceptional-case motion relied in part on portions of its interrogatory responses. (Op. & Order at 14-15; ECF Resp. App. at 163 (citing ECF Mot. App. at 176-179.) A review of the interrogatory responses reveals that Allcare described its efforts to investigate Highmark's system prior to April 2002 in terms of actions taken by Shelton. For example, in response to Highmark's interrogatory calling upon Allcare to describe its investigation into Highmark's system, Allcare responded that it was Shelton who initiated the Seaport Survey and, after review of the results, Shelton who concluded that further investigation was warranted. (ECF Mot. App. at 162-66.) Shelton then apparently performed the additional investigation, reviewing Highmark's website and other internet sources, as well as performing other "follow-up research." (*Id*.) Shelton then sent the April 2002 letter to Highmark, stating Allcare's belief that Highmark's system infringed the '105 patent and suggesting that Highmark license the patent to avoid litiga-

tion. (*Id.* at 164, 342-44.) According to the interrogatory responses, Allcare began its efforts to have Highmark purchase a license to the '105 patent after Shelton "formed the opinion" that Highmark's system was infringing it; Hill is not mentioned with regard to the pre-filing investigation until October 2002. (*Id.*)

Allcare's focus on Shelton's pre-filing efforts, as opposed to Hill's, is due at least in part to Allcare's concern for privilege issues. In its response to Highmark's interrogatory, Allcare objects that the interrogatory requests attorney-client privileged information and work product. (ECF Mot. App. at 161.) And rather than detail Hill's pre-filing efforts in response to the exceptional-case motion, Allcare relied largely on a declaration by Hill providing general assurances that a pre-filing investigation was conducted and citing the interrogatory response detailing Shelton's efforts. In its brief in response to the exceptional-case motion, Allcare again notes its privilege concerns.

Allcare is not required to disclose privileged information in defense of its pre-filing efforts. But privilege issues notwithstanding, Allcare and its counsel must comply with the law, including Rule 11. *See Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.,* 383 F.3d 1337, 1344 (Fed. Cir. 2004) (stating that "the duty to respect the law is undiminished" even where the attorney-client privilege applies). Highmark's motion for exceptional-case finding clearly raised the issue of whether Allcare's conduct in this case, including its pre-filing investigation, comported with

35 U.S.C. § 285 and Rule 11. In responding to Highmark's argu-
ments, Allcare was not entitled to at once rely on the opinion of
counsel to justify its filing of counterclaims but withhold the
details of counsel's pre-filing efforts--the sort of details that
would allow the Court to verify the adequacy of counsel's efforts--
based on privilege. *See In re Seagate Tech, LLC*, 497 F.3d 1360,
1372 (Fed. Cir. 2007) (stating that the attorney-client privilege
is not to be used at once as a sword and shield). Federal courts
are accommodating regarding privilege issues and allow ex-parte and
in-camera filing where appropriate. Nevertheless, Allcare essen-
tially chose to rely on Shelton's investigation and analysis in
responding to the exceptional-case motion, at least as to the time
leading up to Allcare's first contact with Highmark in April 2002.

Hill now explains that he did not defer to Shelton's investi-
gation. Rather, he worked with Shelton in investigating Highmark's
system, independently assessed the information available, and
confirmed Shelton's conclusions. (Hill's SCO Resp. App. at 382.)
Specifically, Hill states that, based on the available literature,
research he and Shelton performed, and the Seaport Survey results,
he concluded that Highmark's system included the following fea-
tures:

    (a)   a web-based portal supported by one or more data
         processors and offering links to pertinent health
         care information for patients, health care provid-
         ers and employers;

    (b)   an online authorization system supported by one or
         more data processors, permitting (1) a physician
         office or hospital to request using an input means

an authorization from the insurer using a form wherein the requesting physician would enter an ICD-9 diagnostic code and a CPT treatment code; and (2) communicating a decision back to the physician relating to the determination in response to the authorization request [sic];

(c)    a medical management system supported by one or more data processors which supported the insurance company in evaluating and deciding whether to approve the authorization requests received the online authorization requests, and then storing the record regarding the decision made for future reference, if needed [sic];

(d)    a claims processing and payment system (a "payment means") supported by one or more data processors working with the medical management system to prevent payment where authorization was required, but not obtained; and

(e)    a claims data warehouse supported by one or more data processors where processed claims are stored and used to accumulate useful and extensive medical information about the population of insured persons.

(Hill's SCO Resp. App. at 383.)

While these conclusions are detailed, there is no detailed discussion in the response to the show-cause order of how Hill reached them based on the evidence he had reviewed. Much as he did in response to the exceptional-case motion, Hill simply states that he reviewed certain sources of information, performed the necessary analysis, and reached these conclusions. But merely reciting the conclusions reached, without providing more detail of how they were reached, such as how Hill's understanding of Highmark's system was supported by a particular piece of evidence or how that understanding compared to the claims of the '105 patent, makes it difficult for the Court to verify that a proper pre-filing investigation was

done.  *Cf. Cupit v. Fid. & Deposit Co. of Md. (In re Cupit)*, 194
Fed. Appx. 257, 258 (5th Cir. Aug. 24, 2006) (noting the burden of
an attorney who has been notified of potential sanctions to show
why he should not be sanctioned); *also cf. Ashcrof v. Iqbal*, 129
S. Ct. 1937, 1949 (2009) (stating that to meet the pleading burden
imposed by Rule 8 the plaintiff must state sufficient facts to
allow the court to infer that his claim is plausible).  If an
attorney could, in response to a show-cause order, show compliance
with Rule 11 merely by recounting conclusions and making general
assurances of a proper pre-filing investigation, Rule 11 would be
a dead letter.

In May 2002, Allcare filed suit against Trigon, with Hill
acting as its counsel.  (ECF Resp. App. at 138.)  Hill began
discussions with Highmark on behalf of Allcare, disclosing in
"considerable detail the basis for Allcare's contention that
Highmark['s system] infringed certain claims, including claim 52,
of the '105 patent."  (*Id*. at 138.)  In July 2002, Hill wrote a
letter to Highmark's counsel referring to Shelton's April 2002
letter, discussing Allcare's research into Highmark's system,
asserting that the '105 patent is not limited to a "diagnostic
smart system" and, in any event, that Highmark's system is smart,
and urging Highmark to purchase a license to the patent.  (Hill's
SCO Resp. App. at 302-05.)  By August 2002, Hill claims to have
performed an element-by-element comparison of claim 52's elements
against the Highmark system that not only incorporated the informa-

16

tion he and Shelton gathered from the internet and other public sources and the Seaport Survey results, but also information on Highmark's system disclosed by Highmark during its discussions with Allcare. (ECF Resp. App. at 139.) Hill informed Highmark's counsel that he believed Allcare's infringement analysis in *Trigon* applied to Highmark's system, because "both systems pertained to the electronic authorization capabilities whereby network providers would use a personal computer to electronically complete an authorization form by filling in ICD9 and CPT codes and then transmit to the insurance company for authorization." (*Id.*) According to Hill, he concluded Highmark's system was "necessarily a utilization review system [covered by the '105 patent], requiring a database of predetermined procedures requiring authorization, as well as other forms of utilization review, such as medical appropriateness review." (*Id.*) Hill explains that when he informed Highmark's counsel of these observations, she did not disagree. (*Id.*) Hill also wrote another letter to Highmark in August 2002, this time including a side-by-side comparison of the Trigon and Highmark systems. (Hill's SCO Resp. App. 306-25.)

The element-by-element analyses Hill claims to have done as of April 2002 and as of August 2002 specifically refer to claim 52. Most notably, he states that "by August 2002, [he] had performed an element-by-element comparison of claim 52's elements with the use of the Highmark system and had determined that there was a factual basis for believing" the system infringed claim 52. (*Id.*

17

at 139.)  The analysis Hill states that he performed after *Trigon*
was filed specifically refers to claim 52 as well.  (*Id.* at 163.)

In response to the show-cause order, Hill hardly addresses
claim 102, arguing only that he did not sign any pleading in
connection with that claim.  But as has been shown, Hill has been
Allcare's chief counsel since before this case was filed and, when
pressed to explain its pre-filing efforts, Allcare relied on Hill.
And any argument by Hill that he is not responsible for the filing
of allegations of infringement as to claim 102 is countered by
Hill's assertion that he performed the pre-filing investigation
relevant to this claim.  (ECF Resp. App. at 154.)  Hill designated
a portion of his declaration in response to the exceptional-case
motion as addressing the issue of "Assertion of Claim 102."  (*Id.*
at 136.)  In the designated portion, Hill states that he performed
an element-by-element comparison of claim 102 to Highmark's system.
(*Id.* at 154.)  But Hill makes this statement in the context of
discussing Allcare's reasons for maintaining the allegations as to
claim 102, without elaborating on his pre-filing investigation.
This, despite the fact that Highmark had specifically argued that
an exceptional-case finding was warranted due to Allcare's defi-
cient pre-filing investigation as to claim 102.  (ECF Mot. Br. at
12.)  And Hill has not expounded upon his pre-filing efforts in
response to the show-cause order, despite the Court's conclusion
in the Opinion and Order that those efforts were deficient.

After this, the only discussion of pre-filing investigation

specifically related to claim 102, Hill goes on to discuss similarities between the terms of claim 52 and claim 102, as well as portions of Holland's report and deposition, including a claim chart, that he contends support Allcare's allegations based on claim 102. Holland's report was issued and his deposition taken after Allcare filed its counterclaims. And the claim chart is dated November 8, 2004, months after the amended answer asserting a counterclaim of infringement of 102 was filed. Thus, none of these items could be part of a pre-filing investigation.

The similarities might be taken to show that pre-filing efforts as to allegations involving claim 52 also support allegations involving claim 102. (ECF Resp. App. at 152-54.) But the language of the claims, both on its face and as construed, is different. For example, as Hill recognizes in his declaration, claim 52 covers a "comprehensive" health-care-management system, while claim 102 covers an "integrated" system. (*Id*. at 152.) Discussing the use of these terms in the '105 patent's claims, the special master concluded that, although these terms are used "in a somewhat overlapping manner," "comprehensive" is used in the patent to indicate the scope of the patent's participants and functions while "integrated" is used to indicate the interaction of the participants and the system's components. (Rep. on Claim Constr., doc. #367, at 11.) After Hill's discussion of the similarity of the terms of claims 52 and 102, only post-filing efforts involving experts are discussed (ECF Resp. App. at 154-56.)

19

Ultimately, Highmark questioned Allcare's pre-filing investigation relating to claim 102. In response, the Court concluded that Highmark's arguments were well founded and, accordingly, imposed sanctions and followed with a show-cause order to ensure compliance with Rule 11. Yet at no point has there been any meaningful explanation of the pre-filing investigation that supported Allcare's assertion that claim 102 had been infringed.

One of the Court's primary criticisms of Hill and the other attorneys sanctioned in the Opinion and Order was their reliance on developments in *Trigon*--whether it was the pre-filing investigation done in that case or the summary-judgment rulings issued by the *Trigon* court--to defend the merits of Allcare's case against Highmark. As the Court explained in the Opinion and Order, reliance on *Trigon* only indicates that an adequate pre-filing investigation was done in this case if Allcare's counsel compared the systems used by Highmark and Trigon. Hill addresses this criticism by offering up the August 2002 letter and the comparison of the responses given by Trigon and Highmark to the Seaport Survey.

Strangely, although Allcare relies heavily on the results of the Seaport Survey in defending its pre-filing investigation, Hill's comparison of the responses and the Seaport Survey responses themselves were not discussed in Allcare's response to the exceptional-case motion. The comparison was not part of the record at the time the exceptional-case motion was decided, and the Seaport Survey itself was submitted by Highmark rather than

Allcare. Allcare's response to the motion for exceptional-case finding, which relied heavily on a declaration by Hill, did not discuss in any detail Allcare's use of the Seaport Survey and other information available on Highmark's system to compare it to Trigon's system. In fact, the response and Hill's declaration discuss claim charts from *Trigon* that were annotated with information produced by Highmark during discovery in this case, implying that claim charts or other forms of infringement analysis in support of Allcare's claims against Highmark did not incorporate information related to Highmark's system until after the counterclaims were filed. (ECF Resp. Br., doc. #526, at 1, n.2.) And to the extent the response to the exceptional-case motion did address similarities between the Highmark and Trigon systems, it was in passing, without factual detail or analysis, and did not address what has become a key element of this case, claim element 52(c). (*Id*. at 2, n.4.)

Having been told by Hill in August 2002 that he believed the systems used by Trigon and Highmark were "equivalent if not identical in all material respects," Highmark's counsel requested to see Allcare's infringement contentions against Trigon in chart form. (ECF Resp. App. at 140.) Hill explains that he provided Highmark a copy of charts showing his infringement analysis in *Trigon* and that later, during the early stage of discovery in this case, he provided an additional chart to Highmark reflecting Allcare's pre-filing investigation in *Trigon* and containing updated information

produced by Highmark during discovery.  (*Id.*)

The Court noted in the Opinion and Order that Allcare's reliance on the *Trigon* charts was typical of its response to the exceptional-case motion as a whole.  Allcare and Hill's post-filing efforts were supported by documentary evidence, such as the annotated *Trigon* charts, while their pre-filing efforts were not. Similarly, Hill asserted that he had consulted experts to confirm his infringement analysis before Allcare's claims against Highmark were filed.  But the documentary evidence suggests that the relevant experts were not consulted until after the counterclaims were filed.  (Op. & Order at 13-14; ECF Suppl. App., doc. #533, at 1-10.)  The lack of detail in Hill's declaration regarding his infringement analysis and the information he gleaned from the various sources on which he purported to rely, coupled with the lack of documentary evidence of a pre-filing investigation by Hill, plus the evidence of Shelton's role in the pre-filing investigation, caused the Court to conclude that an inadequate investigation had been performed.

Finally, in connection with the pre-filing investigation, Hill points out that in February 2003, the summary-judgment rulings were issued in *Trigon*.  (*Id.* at 142-43.)  *Trigon* was filed in May 2002, and Hill explains that after a meeting with Highmark's counsel in October 2002, it was apparent that the *Trigon* litigation and Allcare's effort to have Highmark take a license of the '105 patent shared two major issues.  (*Id.* at 143.)  Both the *Trigon* litigation

and Allcare's discussions with Highmark involved construction of claim element 52(c), and specifically the issue of whether it covered only a diagnostic smart system. And both the *Trigon* litigation and Allcare's discussions with Highmark addressed the adequacy of the disclosure of prior art by Allcare in securing the '105 patent, and the impact of such disclosure on validity and enforceability of that patent. (ECF Resp. App. at 141.) The *Trigon* Court issued summary-judgment rulings in February 2003. (*Id.* at 41-66.) That court concluded that the '105 patent is enforceable and that element 52(c) is not limited to a diagnostic smart system. (*Id.* at 45, 57-65, 143.)

### c. Shifting Claim Construction

The Court also cited Allcare's shifting claim construction as a basis for sanctioning Hill. Hill argues that sanctions are inappropriate on this basis because each claim construction had a good-faith basis in law and fact. While this may be true, the Court's point was that Allcare, without reasonable explanation, altered its claim construction after Allcare submitted its court-ordered proposed claim construction. That is, although Allcare's constructions subsequent to its proposed construction may have been substantively defensible, they unduly complicated Highmark's efforts to defend against Allcare's allegations and this Court's efforts to resolve the issue of claim construction.

Hill now explains that it is "not unusual" in patent litiga-

tion for a party to adjust its claim construction during the course
of litigation. Although adjustments in a party's proposed con-
struction may be common in an effort to reach an agreed construc-
tion, neither section 285 nor Rule 11 allows a party or its counsel
to needlessly offer amended constructions over the course of a
case. *See* Fed. R. Civ. P. 11(b)(1). And the Court entered a
scheduling order in this case providing specific instructions
regarding claim construction. Under the scheduling order, Allcare,
as the party claiming patent infringement, was to submit a proposed
claim construction in August 2004. (Initial Sched. Order, doc. #59,
at ¶6.) Highmark would then submit a responsive proposed claim
construction. Thereafter, the parties were to confer and submit
a joint claim-construction statement, which would contain the
construction of the relevant claims to the extent that the parties
had reached an agreement and would contain each party's proposed
construction for terms that remained in dispute. Allcare could
then file a motion for claim construction on the disputed terms.

Allcare timely filed its proposed claim construction under the
Court's scheduling order, in which it construed, among other terms,
the phrase from element 52(c) "data symbolic of symptoms for
tentatively identifying a proposed mode of treatment." (ECF Mot
App. at 392-93.) But Allcare then changed its proposed construc-
tion of this phrase in its motion for claim construction, (doc.
#158), circumventing the response by Highmark and the attempt at
reaching an agreement contemplated by the scheduling order. After

24

the special master had conducted a claim-construction or "*Markman*" hearing, Allcare again altered its proposed construction in a chart of "claim terms at issue and the constructions of said terms that are acceptable to Allcare," which was disclosed to Highmark on November 15, 2006. (ECF Mot. App. at 411.)

Hill complains that he cannot be sanctioned based on the altered claim constructions because he was not given notice of constructions that concerned the Court so that he could respond to the show-cause order. But as the Court noted in the show-cause order, the factual basis that the Court believed warranted sanctions was that raised in Highmark's exceptional-case motion and set out in the Opinion and Order. Allcare's proposed claim construction, its motion for claim construction, and the chart of claim terms were each identified as being the documents containing the relevant constructions. The fact that the Court did not identify a specific claim term is of no import because *any* alteration by Allcare of its claim construction that was not agreed to or was not with leave of court was contrary to the scheduling order if it came after it filed its proposed construction.

d. Preclusion Defenses

An additional ground for sanctions against Hill discussed in the Opinion and Order is Allcare's assertion of the defenses of res judicata and collateral estoppel. Hill first argues that he was not admitted to practice before this Court at the time that these

defenses were filed.  But as has been explained, Hill was Allcare's
lead counsel since before this case was filed and he has advocated
its positions throughout.  In fact, this is confirmed by Hill's
second argument on this point, which is that he researched the
applicability of these defenses to this case and believed that
asserting them was reasonable.

In support, Hill cites *Boston Scientific Corp. v. Schneider
(Europe) AG*, 983 F. Supp. 245 (D. Mass. 1997), which discusses the
circumstances under which a nonparty may be precluded from
relitigating issues.  Specifically, the court in *Boston Scientific*
applied the doctrine of virtual representation in the patent-
infringement context to preclude a party from litigating issues
that had been previously litigated by a related entity in a sepa-
rate suit.  *See Boston Scientific Corp.*, 983 F. Supp. at 257-59.
In so doing, that court described the doctrine of virtual represen-
tation as "an equitable theory rather than a crip rule with sharp
corners and clear factual predicates."  *Id.* at 257.   Privity
between the party and nonparty "must be determined on a case-by-
case basis" considering whether the issues in both the prior and
current litigation are identical, whether the nonparty had actual
or constructive notice of the prior litigation, and the equities
of the case, including the nonparty's relationship with the party
or participation in the prior litigation.  *Id.* at 257-58, 259.

Hill explains that *Trigon* and Allcare's efforts to have High-
mark license the '105 patent included identical issues, such as

26

construction of the patent's claims.  And Hill notes that he observed Highmark's counsel, Cynthia Kernick, at the hearing on the summary-judgment motions in *Trigon.*  According to Hill, Kernick conferred with Trigon's counsel during the hearing to provide assistance with Trigon's arguments.  (Hill's SCO Resp. App. at 398.)  Thus, two of the elements of virtual representation--identity of interest and notice of the prior litigation--were met.  And the third element, the balance of the equities, has at least some support (though it is hard to imagine how holding Highmark bound by the *Trigon* ruling could be equitable given the lack of relationship between the two and Highmark's very limited--and completely unofficial--role in the case).


        e.  Continued Pursuit of Infringement Allegations

Finally, the Court concluded in the Opinion and Order that Allcare and its counsel maintained their allegations of infringement as to claims 52 and 102 even after those claims were shown to be without support.  The Attorneys invoke the "snapshot" rule, arguing that a court must evaluate a filing for compliance with Rule 11 at the time of filing.  "Like a snapshot, Rule 11 review focuses upon the instant when the picture is taken--when the signature is placed on the document."  *Thomas v. Capital Sec. Servs.*, 836 F.2d 866, 874 (5th Cir. 1988).  Recognizing that the snapshot rule remains the law of this circuit at least as to sanctions imposed based on the filing or signing of a document, *see*

*Marlin v. Moody Nat'l Bank N A*, 533 F.3d 374, 380 (5th Cir. 2008), since *Thomas* Rule 11 has been amended to provide that "later advocating" a baseless position is a ground for sanction. There is simply no way that the a snapshot rule phrased in terms of the time of filing can be applied to the plain language of Rule 11, which provides for sanctions where an attorney advocates a baseless position after the relevant filing is made. As the notes to the 1993 amendment explain, "[t]he rule continues to require litigants to 'stop-and-think' before initially making the legal or factual contentions. It also, however, emphasizes the duty of candor by subjecting litigants to potential sanctions for insisting upon a position after it is no longer tenable . . . ." Thus, whether Allcare's allegations were tenable after the events discussed in the Opinion and Order and whether Hill advocated those allegations become the critical issues.

In the Opinion and Order, the Court determined that the Attorneys are subject to sanctions because they "continued to pursue the infringement claims against Highmark well after those claims had been shown to be without merit." (Op. and Order at 48.) As discussed, Hill began his representation of Allcare regarding prosecution of the '105 patent in March 2002. Hill was the attorney who performed the pre-filing investigation into Highmark's system, Hill was the attorney who developed Allcare's construction of the '105 patent generally and in connection with *Trigon*, and Hill was the attorney who presented Allcare's theory of infringe-

ment at the April 2002 strategy session.  Hill has been regarded
as Allcare's lead counsel throughout this litigation, with even
Hill conceding that at least by February 2004 he was Allcare's de-
facto lead counsel.  Hill is listed as counsel on every filing that
advanced Allcare's allegations relating to claims 52 and 102,
including Allcare's original answer that asserted infringement of
claim 52 (doc. #22), Allcare's amended answer that asserted in-
fringement of claim 102 (doc. #124), and the summary-judgment
briefing (docs. #143).  Each of the attorneys who actually signed
these filings have provided declarations showing that they regarded
Hill as lead counsel and deferred to Hill on the pre-filing inves-
tigation and subsequent substantive issues.  (Cleveland Declara-
tion, doc. #587 at 11-12 (describing his role in this case as
functionally that of local counsel, and that he did not substan-
tively revise documents that were passed on to him for signing and
filing); Medlock Declaration, doc. #617-2, at 7-17 (describing
Hill's involvement in this case and Medlock's reliance on Hill's
efforts).  And when the issue of  of Allcare's pre-filing investi-
gation was raised by Highmark in the exceptional-case motion, it
was Hill who responded on Allcare's behalf detailing his pre-filing
efforts both as to claim 52 and 102.  Consequently, the Court
concludes that Hill sufficiently advocated Allcare's allegations
as to claims 52 and 102 to be held accountable for them.

     As for the merit of those allegations, prior to concluding
that Allcare's counsel should be sanctioned for continuing to

pursue the infringement claims, the Court discussed the report and deposition of Allcare's expert, Dr. Holland. As construed by the special master, the 102 claim limits itself to a system including an "integrated interconnection and interaction of the patient, healthcare provider, bank or other financial institution, insurance company, utilization reviewer/case manager and employer." (Cl. Constr. Rep., doc. #367, at 20-21.) The Court concluded that in his August 2007 deposition Holland conceded that Highmark's system did not provide for this sort of interconnection and interaction. (ECF Mot App. at 293-94.) More specifically, Holland testified that in Highmark's system the patient does not appear to interact with the financial institution and the employee does not appear to interact with the employer. (*Id.*) The Court adopted the special master's report on claim construction in March 2007. Thus, based on the arguments and record existing at the time of the Opinion and Order, it appeared that after Holland's deposition it was clear that the preamble to claim 102 was a claim limitation and that Highmark's accused system did not satisfy such limitation. Allcare, however, maintained its allegation that Highmark's system infringed claim 102 until February 6, 2008.

In response to the exceptional-case motion, Hill explained that a diagram in Holland's report showed that Holland was of the opinion that the employee could interact with the employer in Highmark's system. (ECF. Resp. App. at 155 (citing (ECF Resp. App. at 81).) But the cited portion of Holland's report is simply a

30

diagram of Highmark's systems showing the "portals" that connect each component. (*Id.* at 81.) There is no discussion of whether these portals allow for the interaction contemplated by claim 102. And this does nothing to address the issue of interaction between the patient and the financial institution.

Hill also insisted that Holland did not concede in his deposition that the allegations regarding claim 102 are without merit, as argued by Highmark. Hill points out that Holland was never asked whether, in order to be found to infringe claim 102, Highmark's system must provide for interaction between the employee and employer and between the bank and the patient. But Hill has not explained why these elements would not be essential. Again, claim 102, by its terms and as construed, requires interconnection *and* interaction between various system users, including those about which Highmark questioned Holland during his deposition.

The similarities between the language of claims 52 and 102 might be argued as a basis for maintaining the allegations based on claim 102. That is, to the extent that Allcare was justified in maintaining its allegations as to claim 52, because of the claims' similar language, Allcare was justified in continuing with its allegations as to claim 102 as well. But, again, claims 52 and 102 are different claims with similar, even overlapping, but nevertheless different terms. Once this case had progressed to the entry of an order on claim construction and to Holland's issuance of an expert report, general similarities in the claims' terms was

no longer a sufficient basis for maintaining infringement allegations as to claim 102.

The Court also adopted the special master's construction of claim 52. Claim element 52(c) provides, in relevant part, for entering "data symbolic of patient symptoms for tentatively identifying a proposed mode of treatment and, when said proposed mode of treatment includes one of said predetermined procedures requiring utilization review, producing indicia thereof." Construction and application of this element has proven critical to this case. Highmark argued that the element covers a diagnostic smart system. Highmark further argued that its system is not a diagnostic smart system. Allcare took the contrary position, arguing that claim element 52(c) covered more than just a diagnostic smart system and that, regardless, Highmark's system was a form of a diagnostic smart system.

Element 52(c) was construed to cover a system into which is entered "information expressed in a symbolic or representative manner pertaining to a noticeable change in a patient's condition indicative of some bodily or mental disease, disorder or other medical condition for tentatively identifying a suggested method of the management and care of a patient to combat disease or injury." The parties stipulated, and the special master agreed, that "for," as used in element 52(c), is "used to indicate the aim, or purpose of an action or activity." Thus, under element 52(c), the aim or purpose of the entry of symptom codes into the patented

system is the tentative identification of a proposed method of treatment. Or, as the special master explained in his infringement analysis, "the physician enters the patient's symptoms and the computer system identifies the most likely medical conditions corresponding to the entered symptoms together with the generally approved treatment." (Infringement Rep., doc. #484, at 11.)

Highmark's system uses ICD9, just as does the system embodied by claim 52. But in Highmark's system, rather than enter the ICD9 code for the system to propose a method treatment, the health-care provider enters ICD9 to reflect the patient's symptoms and, separately, enters CPT code to reflect the proposed treatment. It is the health-care provider, not the system, that proposes the treatment under Highmark's system. Holland's June 2007 report seemed to concede this distinction between the system embodied by claim 52 and Highmark's system. As the special master explained:

> Accepting, for purposes of this summary judgment motion, Dr. Holland's testimony that ICD9 codes are sometimes used as data symbolic of patient symptoms, in the accused system the physician enters data symbolic of patient symptoms (ICD9 code), and enters data tentatively identifying a proposed mode of treatment (CPT Code). The ICD9 code is not entered for identifying a proposed treatment as claimed. The ICD9 codes indicate the 'condition for which the patient is receiving treatment.' [Citing Holland's report] at ¶ 457. They do not *identify* the treatment.

(Infringement Rep. at 14.) Holland further acknowledged in his report that utilization review in Highmark's system is done by the system's considering the "procedure" or treatment code. (*Id.* at 13-14.) Again, this code is entered separately from the ICD9

symptom code after the proposed treatment is determined by the health-care provider, which differs from the system covered by claim 52 in which a symptom code is entered "for [the system to] tentatively identify[] a proposed mode of treatment." (*Id.*)

Additionally, the Court noted that Allcare had explained some of what the Court perceived to be a deficiency in its pre-filing investigation and its continued pursuit of allegations against claims 52 and 102 by asserting that Highmark had refused to give Allcare's experts access to Highmark's system. When Highmark made its system available in April 2004, Allcare did not send an expert to perform an inspection. Highmark argued in its exceptional-case motion that had an expert performed an inspection Allcare would have realized its claim were unsupported.

The inspection issues and Holland's report and deposition notwithstanding, Allcare persisted in its allegations as to claims 52 and 102, with summary judgment being entered in Highmark's favor on claim 52 based largely on Holland's report. Allcare did not respond to Highmark's summary-judgment arguments relating to infringement of claim 102 and eventually withdrew its allegations.

Hill explains that Highmark made its system available for inspection in April 2004 only in response to an order granting a motion to compel by Allcare. Hill insists that the order caught him on short notice, and that he was unable to arrange for Holland or any other expert to be present during the inspection. To compensate, Allcare had the system inspection transcribed and

34

videotaped for later review by Holland.  And Hill further explains that to criticize him and Allcare for continuing to pursue the allegations of infringement after the April 2004 inspection does not adequately take into consideration that: (1) at that point no claim construction had been entered in this case; (2) that a construction favorable to Allcare had been entered in *Trigon*; (3) that, in Allcare's opinion, the inspection of Highmark's system supported its allegations; and (4) that other companies with systems similar to Highmark's had just purchased licenses to the '105 patent.

Additionally, Hill insists that Holland's report did support Allcare's allegation that claim 52 had been infringed.  Hill points out that Holland opined in his report that symptom codes are entered into Highmark's system for proposing a mode of treatment. According to Holland, in Highmark's system utilization review is begun with an authorization form.  (ECF Resp. App. at 87.)  It is this form where the ICD9 symptom codes are entered and, once the form is complete, it is submitted for utilization review.  (*Id*.) The completed form, Holland insists, is the proposed mode of treatment and, thus, the symptom code entered into the form is entered "for tentatively identifying a proposed mode of treatment" as required by claim 52.  (*Id*.)

This is quite a thin reed on which to base Allcare's claims. This theory was rejected, rather soundly, by both the special master and the Federal Circuit.  The special master noted Allcare's

35

argument that the entire authorization code is the proposed treat-
ment, and explained that in completing the form the health care
provider selects and enters CPT code into the authorization form
and that it is the CPT code, not the form as a whole, that identi-
fies the proposed procedure. (Infringement Rep. at 14.) In
support of his recommendation that summary judgment be entered in
favor of Highmark, the special master cites the portion of Hol-
land's report cited above, in which Holland characterizes
Highmark's utilization review as being based on consideration of
"procedure codes," rather than the authorization form as a whole.
(*Id*.) Hill offers no other theory on which Allcare could have
reasonably maintained its allegations as to claim 52.

And as the Court explained in the Opinion and Order, this is
not the sort of run-of-the-mill case in which a party advanced
claims and theories with which the Court ultimately disagreed. In
response to Highmark's exceptional-case motion, Allcare explained
that it waited to withdraw its infringement allegation of claim 102
until after deposing Highmark's expert, Jeremy Nobel, at which
point Allcare concluded "that narrowing the issues for trial to
infringement of claims 52 and 53 did not present an undue risk to
Allcare of a patent invalidity finding." (ECF Resp. Br. at 16-17.)
But nowhere--not in the response to the exceptional-case motion,
in Hill's motion to reconsider, or in Hill's response to the show-
cause order--does Hill or Allcare explain how maintaining allega-
tions that claim 102 had been infringed protected Allcare from a

finding that the '105 patent was invalid. Rather, as the Court concluded in the Opinion and Order, the circumstances suggest that the allegations as to claim 102 were maintained as leverage. And in any event, they were maintained to a point that Highmark was forced to pay an expert to provide an opinion as to whether its system infringed claim 102 and to address Allcare's allegations based on claim 102 its motion for summary judgment.

Hill refers to the arguments made by Allcare's other attorneys in his response to the show-cause order. Mike McKool Jr., Christopher Harrington, Luke McLeroy, and R. Darryl Burke, and their firm, McKool Smith, LLP ("the McKool Smith attorneys"), argue that maintaining the allegation of infringement as to claim 52 was not objectively unreasonable, even after Holland's report, because Allcare had argued that element 52(c) also covered a "utilization review system," a system for the "review of the medical necessity or the efficiency or the quality of health care services, either prospectively, concurrently, or retrospectively." This argument is similar to, but more elaborate than, that offered by Hill.

Element 52(c), after disclosing the entry of symptom data and identification of proposed treatment, addresses utilization review and the patented system's "producing indicia thereof." That is, if the proposed mode of treatment is one that requires utilization review, the system will "cause[] to exist a sign, indication, or identifying mark indicating that utilization review is required." (Cl. Constr. Rep. at 39.) As noted in the Opinion and Order, by

the time of the report on claim construction, the parties agreed that element 52(c) covered at least a diagnostic smart system. (Infringement Rep. at 11.) The special master refused in his report, however, to state whether the element covered only such a system or covered a utilization-review system as well, because to do so would have been to improperly perform an infringement analysis at the claim-construction stage.

Ultimately, the special master concluded that although claim 52 covered a utilization-review system, Highmark's system did not infringe the '105 patent. In the system disclosed by element 52(c), symptom data is entered for the purpose of the system's proposing a method of treatment *and*, if necessary, the system indicates that utilization review is required. In the Highmark system, the health care provider enters one code to reflect the patient's symptoms and, separately, enters a code to reflect the proposed treatment. Highmark's system then determines whether utilization review is necessary by comparing the proposed treatment to a list of treatments stored in a database. Thus, in the Highmark system, symptom codes are not entered "for" the system to propose a mode of treatment, as in the system disclosed by element 52(c). And Highmark's system, unlike the disclosed system, performs utilization review based on the proposed treatment codes entered by the health care provider.

The diagnostic smart system is a specific embodiment disclosed in the '105 patent. And it is true, as argued by the McKool Smith

attorneys, that the mere fact that a claim covers a specific embodiment does not mean that the claim cannot cover other ways of practicing the invention. *See Home Diagnostics, Inc. v. LifeScan, Inc.*, 381 F.3d 1352, 1357 (Fed. Cir. 2004). But although true in the abstract, the McKool Smith attorneys do not meaningfully explain how this principle applies in this case. They argue that the fact that element 52(c) was construed in such a way as to cover at least a diagnostic smart system did not foreclose the element from covering other systems. But the McKool Smith attorneys do not explain how it was reasonable to believe that element 52(c) could actually cover other systems under the facts of this case. As the special master acknowledged in his report on infringement, it is improper to limit a claim to a specific embodiment. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1323 (Fed. Cir. 2005). Yet a claim's terms are not construed in isolation, as a claim is "part of a fully integrated instrument consisting principally of a specification," which often describes specific embodiments. *Id.* at 1315. "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id.* (quoting *Vitronics*, 90 F.3d at 1582). "The specification is . . . the primary basis for construing the claims." *Id.* (quoting *Standard Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448, 452 (Fed. Cir. 1985)). In this case, element 52(c) covers a system in which "data symbolic of patient symptoms" is entered "for tentatively identifying a

proposed mode of treatment" and the specification discloses an
embodiment in which the central processing system determines the
recommended treatment using the symptoms codes.  (Infringement
Rep. at 11.)  The special master observed that while it would be
improper to simply limit claim 52 to this specific embodiment, the
claim's use of the word "for" must be understood in this context.
Doing so makes it clear that "for," as used in element 52(c),
indicates a cause-and-effect relationship; that the proposed
treatment is determined by the patented system using the entered
symptom data.  And again, in his report Holland recognized that in
Highmark's system the health-care provider entered ICD9 code to
record symptoms and separately enters CPT code to reflect the
proposed mode of treatment.

The McKool Smith attorneys argue that the fact that Allcare
stipulated to the meaning of "for" as used in the claim element
shows that Allcare and its attorneys believed Allcare had reason-
able arguments on this claim.  But the fact that Allcare and its
attorneys agreed early on to a meaning of "for" that, in the
context of the patent, established that a computer operated by the
patented system would determine the proposed treatment only
strengthens the conclusions in the Opinion and Order.

    f. Summary as to Hill and Hill, Kertscher, &
      Wharton, LLP

To summarize, Hill has led Allcare's efforts to prosecute the
'105 patent, both generally and against Highmark in particular.

While this case was pending before the Western District of Pennsylvania, Hill participated in a motion to dismiss that contained what are at least misleading statements about Allcare's role in the Seaport Survey. Hill may have had no subjective knowledge of these statements, but as the attorney leading Allcare's prosecution of the '105 patent and as an attorney listed on the motion, it was Hill's duty to review the motion and its supporting evidence to ensure the motion was based on reasonable assertions of law and fact.

Even so, if any court were to issue sanctions based on the motion, it would be most appropriate for the Western District of Pennsylvania to do so. It was that court in which the misleading motion was filed. In any event, the Western District of Pennsylvania apparently did not give the representations about Allcare's involvement in the Seaport Survey much weight as, rather than dismissing the case, it transferred the case here.

Moreover, "sanctions must be imposed within a time frame that has a nexus to the behavior sought to be deterred." *Thomas v. Capital Sec. Servs.*, 836 F.2d 866, 881 (5th Cir. 1988). Over five years passed between the filing of the motion to dismiss and Highmark's filing of the exceptional-case motion, which brought Shelton's statements to the Court's attention. Another year and a half passed before the Court imposed sanctions based in part on the motion to dismiss.

Similarly, Hill's role in Allcare's shifting claim construc-

tion does not support sanctions. Hill's explanation that Allcare's alterations of its claim construction, contrary to the scheduling order and without Highmark's agreement, is typical of a patent case is wholly unsatisfactory. Nevertheless, the documents relevant to the shifting claim construction were filed or disclosed between July 2004 and November 2006, years before Highmark's motion or the Opinion and Order.

Hill's role in Allcare's assertion of the defenses of res judicata and collateral estoppel based on Highmark's role in *Trigon* does not support sanctions either. Hill's response to the show-cause order explains that *Trigon* and Allcare's efforts against Highmark shared key issues, such as construction of the '105 patent, and that he personally observed Highmark's counsel attend the summary-judgment hearing in *Trigon* and appear to advise *Trigon's* counsel during the hearing. The doctrine of virtual representation is equity-based and nebulous, as demonstrated by the case law cited by Hill. And, Shelton's letter disavowing any use of preclusion-based defenses aside, the doctrine was at least arguably satisfied by the facts of which Hill was aware.

Hill has not satisfactorily explained the other bases for sanctions discussed in the Opinion and Order. As for the pre-filing investigation, however, Hill has addressed at least some of the deficiencies discussed in the Opinion and Order. For example, the Court's conclusion that Hill's pre-filing investigation was inadequate was based in part on the lack of documentary evidence

showing such an investigation occurred, while post-filing efforts, such as the annotation of the *Trigon* charts or the retention of experts, were documented. Hill has now provided documentary evidence supporting his pre-filing investigation in the form of the comparison of the responses to the Seaport Survey by Trigon and Highmark. These items show that Hill had information supporting his understanding of Highmark's system prior to filing. Relatedly, the Court faulted Hill for relying on his pre-filing efforts in *Trigon* and the *Trigon* summary-judgment rulings in *Trigon* to justify Allcare's case against Highmark. The comparison of the survey responses shows that Hill and Allcare had a basis for believing that pre-filing efforts in *Trigon* were relevant to the case against Highmark, and that the summary-judgment rulings, which addressed among other things the construction of the '105 patent, were relevant to the case against Highmark as well. Hill has also offered a reasonable explanation for why an expert was not taken to inspect Highmark's system in April 2004.

But Hill continues to provide essentially a "trust me" assurance that he relied on relevant evidence and performed a good-faith analysis before concluding that Allcare's claims were supportable. Hill's evidence is particularly conclusory with regard to his efforts as of April 2002, when Allcare first contacted Highmark about licensing the '105 patent. Because the Court addressed the privilege issue in the Opinion and Order, attorney-client privilege is no longer an excuse for Hill's not providing a more detailed

accounting of his pre-filing efforts so the Court could verify that Hill, in fact, performed the necessary analysis.

And as for Allcare's maintenance of its allegations of infringement, claim 52 was construed to cover only a diagnostic smart system, a system that proposes a mode of treatment in response to the entry of a symptom code. This construction was a product not only of the specific embodiment of a diagnostic smart system in the '105 patent, but of the parties' agreed claim construction. And regardless of whether it was foreseeable that claim 52 would be limited to a diagnostic smart system, it was clear that it was so limited for the purposes of this litigation after the Court adopted the special master's recommendation on claim construction. Holland recognized that, in Highmark's system, the proposed mode of treatment is entered separately, as opposed to being generated by the system. Holland further recognized that utilization review in Highmark's system is performed based on the separately-entered treatment code. This contradicts the theory advanced by Holland and Hill that allegedly justified Allcare's continued prosecution of claim 52, which is that the authorization form as a whole is the proposed mode of treatment.

Hill defends Allcare's continued prosecution of claim 102 based on similarities between its language and that of claim 52. But, again, whatever their similarities, they are separate claims with separate terms and those terms result in each claim's having a different scope. Hill also argues that, rather than conceding

that Highmark's system did not allow for the sort of interaction of system users required by claim 102, as argued by Highmark, Holland's report and deposition supported prosecution of claim 102. But by its terms and as construed, claim 102 covers a system that generally requires interaction of system users. Holland seemed to recognize in his deposition that certain users do not interact in Highmark's system, and even Allcare itself apparently recognized that its allegations under claim 102 could not be supported as it ultimately withdrew them.

Finally, this was not simply a case in which a party made arguments that were ultimately rejected by the Court. Allcare's response to the exceptional-case motion and Hill's declaration statements show that Allcare maintained allegations based not on their merit, but as leverage against Highmark's claims.

Yet there are at least some portions of the record before the Court that support the filing and maintenance of Allcare's infringement allegations. Hill's declarations describe his pre-filing investigation after April 2002 as incorporating new information gathered through research he and Shelton performed and through his conversations with Highmark and its counsel. This, combined with the evidence of the Seaport Survey and Hill's comparison of Trigon and Highmark's responses to the survey and the summary-judgment rulings in *Trigon* arguably support Allcare's prosecution of at least claim 52.

With the *Trigon* rulings, Allcare secured a construction of

claim 52 that was not limited to a diagnostic smart system, which supported one of its theories of infringement in this case. To the extent that this Court entered a claim construction that differed from that in *Trigon*, Allcare might have argued that its maintenance of the claim-52 allegations were an effort to obtain a final judgment so that the construction could be appealed. *See Regents of the Univ. of Cal. v. DakoCytomation Cal., Inc.*, 517 F.3d 1364, 1371 (Fed. Cir. 2008) (noting that the Federal Circuit generally does not certify the issue of claim construction for interlocutory appeal). And with the Seaport Survey, Allcare obtained from Highmark some evidence that, even if claim 52 covers only a diagnostic smart system, Highmark's system infringed. The responses by Highmark submitted by Hill indicated that its system has some capacity to suggest a proposed treatment. Perplexingly, Hill does not make any of these arguments or point to any of this evidence in defending his role in filing or maintaining Allcare's allegations of infringement.

Even this leaves the filing and maintenance of allegations related to claim 102 unsupported. The Seaport Survey and Hill's comparison of the survey responses predate the amendment adding the counterclaim based on claim 102. But by the time of the amendment, Holland had issued his report and had been deposed and had apparently recognized that users of Highmark's system could not interact as contemplated by claim 102. Moreover, unlike the other bases for sanctions discussed in the Opinion and Order, such as the shifting

claim construction, sanctions based on the filing and maintenance of infringement allegations would be based on pleadings. *See Thomas*, 836 F.2d at 881. Sanctions must generally bear a temporal nexus to the conduct to be sanctioned, but sanctions based on pleadings may, under some circumstances, be imposed at the end of the suit. *See id.* All of this is to say, the sanctions issue against Hill is a very close call and despite the foregoing considerations weighing against sanctions they may nevertheless be appropriate. But because there is some consideration weighing against sanctioning Hill for almost all of the conduct discussed in the Opinion and Order, the Court will err on the side of caution given the potentially harsh side-effects upon reputation, client retention, and livelihood that court-imposed sanctions can have and vacate the imposition of sanctions against Hill.[5]

### 2.   Joseph Cleveland and Brackett & Ellis, PC

In the Opinion and Order, the Court concluded sanctions against Joseph Cleveland and his firm, Brackett & Ellis, PC, were warranted based on Cleveland's participation in the shifting claim construction and Allcare's continued pursuit of infringement

---

[5] This conclusion has no bearing on the Court's exceptional-case finding against Allcare. Allcare was free to present any evidence it saw fit to defend against Highmark's arguments under section 285, and it chose not to submit documents such as the August 2002 letter with the comparison of the responses by Trigon and Highmark to the Seaport Survey and chose to rely on a declaration by Hill that lacked sufficient detail for the Court to verify compliance with section 285 and Rule 11. As explained in the order granting reconsideration and to show-cause, Hill and the other attorneys initially sanctioned were allowed to present additional argument and evidence to ensure compliance with Rule 11's procedure, not to give Allcare a second chance to defend its actions.

allegations after Holland's report and deposition.

For the reasons discussed above, the shifting claim construction is not a proper basis for sanctions. And, also for the reasons discussed above, the Court has concluded that it will not impose sanctions based on the continued prosecution of the infringement allegations.

Cleveland argues that sanctions against him are inappropriate for the additional reason that, although designated lead counsel, he was functionally local counsel. Cleveland points out that this case was filed before the Court adopted its current ECF procedures, so he would receive copies of documents to be filed, distribute and serve copies as necessary, and, after some review, sign and file the documents. (Cleveland Decl., doc. #587, at 10.) Cleveland's review of documents focused on ensuring compliance with local rules and included a limited review of the substances of the filing, for which he relied on Allcare's "chief" counsel. (*Id.*) Cleveland states that Hill, along with Medlock, presented their evaluation of the merits of Allcare's case against Highmark. And the record as a whole bears out that Hill was Allcare's chief counsel, and it was Hill that made substantive decisions in Allcare's prosecution of the '105 patent. (*Id.* at 3 (noting that Hill was Allcare's lead counsel in *Trigon*); at 6 (discussing Hill's presentation of the merits of Allcare's case against Highmark).) An attorney may place "some reliance" on the investigation and factual information provided by an attorney that preceded him in the case. *Smith v.*

*Our Lady of the Hospital Lake, Inc*., 960 F.2d 439, 446 (5th Cir. 1992). Under Rule 11, notwithstanding reliance on another attorney's efforts, the signing attorney certifies the reasonableness of a filing and may be sanctioned if the filing does not have reasonable basis or is for an improper purpose. *See* Fed. R. Civ. P. 11(a), (b). But given the extent of Hill's leadership role in this case, the Court concludes that Cleveland's reliance on Hill should not expose Cleveland to sanctions. Accordingly, the Court will vacate the sanctions imposed on Cleveland.

### 3. V. Bryan Medlock and Sidley Austin, LLP

V. Bryan Medlock and his firm, Sidley Austin, LLP, were sanctioned in the Opinion and Order based on Medlock's signing Allcare's original answer, in which it alleged that claim 52 had been infringed and in which it asserted the defenses of res judicata and collateral estoppel. In his declaration in response to the show-cause order, Medlock provides an explanation similar to that of Hill to justify the assertion of the preclusion defenses. And just as did Cleveland, Medlock relied on Hill's pre-filing investigation and strategic decisions on substantive issues in filing Allcare's allegation that Highmark's system infringed claim 52. Medlock states that he was aware that Hill had been involved in Allcare's efforts to prosecute the '105 patent since early 2002, and that Hill and Shelton presented to him their understanding of the merits of Allcare's case against Highmark in the April 2002

strategy session.  Thereafter, Hill lead Allcare's efforts against Highmark, with Medlock acting only as a sounding board for his ideas.

The Court notes that Medlock has already filed a notice of appeal, and that he filed his motion for reconsideration after that notice.  "Generally, a notice of appeal divests the district court of jurisdiction over the judgment or order that is the subject of the appeal." *Sierra Club, Lone Star Chapter v. Cedar Point Oil Co.,* 73 F.3d 546, 578 (5th Cir. 1996).  But a district court may seek leave from the court of appeals to entertain a motion to reconsider, *Shepherd v. International Paper Co.,* 372 F.3d 326, 329 (5th Cir. 2004), and this Court hereby seeks such leave of the Federal Circuit.  Once leave is sought, the appellant may file a motion to remand so that the district court may grant reconsideration.  *See id.*  In the event Medlock does so, and his case is remanded to this Court, the sanctions imposed on Medlock will be vacated.


### 4.    The McKool Smith Attorneys

The McKool Smith attorneys were sanctioned in the Opinion and Order for assisting Allcare in continuing to pursue allegations of infringement after those allegations were shown to be unsupported. Aside from defending the merits of those allegations, similar to Cleveland and Medlock, the McKool Smith attorneys' chief argument is that they relied on Hill's investigation and analysis on the

issue of infringement.  According to the McKool Smith attorneys, their involvement in this case focused on the issues of damages and trial strategy.  Again, as with Medlock and Cleveland, given that the record shows that Hill made the strategic and substantive decisions regarding claim construction and infringement in Allcare's prosecution of the '105 patent, and that Hill made representations to the other attorneys regarding the merit of Allcare's claims against Highmark and his investigation into such claims, the McKool Smith attorneys should not be sanctioned for relying on Hill.  Consequently, the sanctions against the McKool Smith attorneys will be vacated.

III.  Conclusion

The issue of sanctions against Hill is a close one, as Hill has not addressed all of the circumstances that the Court concluded warrant sanctions in the Opinion and Order, and many of the expla-nations Hill has offered are less than satisfactory.  Nevertheless, the Court has been presented with some consideration weighing against sanctioning Hill for almost all of the conduct discussed in the Opinion and Order.  As for the other attorneys, in light of Hill's leadership role in this case and his representations to them regarding his investigation of Allcare's claims, they will not be sanctioned for relying upon Hill.

Accordingly, the sanctions imposed on Steven Hill and his firm, Hill, Kertscher, & Wharton, LLP; Joseph F. Cleveland and his

firm, Bracket & Ellis; and Mike McKool Jr., Christopher Harrington, Luke McLeroy, and R. Darryl Burke and their firm, McKool Smith LLP are hereby VACATED. The clerk of Court is DIRECTED to refund the sanctions paid by these attorneys. In the event that the Federal Circuit remands the issue of the sanctions imposed on V. Bryan Medlock and his firm, Sidley Austin, LLP, those sanctions will be vacated as well.

SIGNED August 9, 2010.

TERRY R. MEANS
UNITED STATES DISTRICT JUDGE